Robert V. BOLINSKE, Plaintiff and Appellant

v.

NORTH DAKOTA STATE FAIR ASSOCIATION, Defendant and Appellee.

Civ. No. 940068.

Supreme Court of North Dakota.

Oct. 3, 1994.

Robert V. Bolinske, pro se.

Douglas Allan Bahr (argued), Asst. Atty. Gen., Bismarck, for defendant and appellee.

LEVINE, Justice.

Robert V. Bolinske filed a complaint in district court, seeking to permanently enjoin the North Dakota State Fair Association (the Association) from interfering with his right to freely circulate initiative petitions at the North Dakota State Fair. The court granted the Association's motion for a summary judgment, dismissing Bolinske's complaint on its merits, and Bolinske appealed. We affirm, holding that the Association's regulations do not violate Bolinske's right of free speech under the First and Fourteenth Amendments of the United State's Constitution or his right to propose laws by the initiative process under Article III, Section 1, of the North Dakota Constitution.

The Association is a statutory agency created under Section 4–02.1–01, N.D.C.C., to conduct an annual state fair:

"*State fair association.* A state fair association, to be known as the North Dakota State Fair Association, is hereby created for the purpose of conducting an annual North Dakota state fair and for the purpose of exhibiting at such fair the agricultural, stockbreeding, horticultural, mining, mechanical, industrial, and other products and resources of this state. The North Dakota state fair shall be held at Minot, North Dakota, at a site to be selected by the state fair association. No other fair may be designated as, nor may any other fair call itself, the state fair."

Under Section 4–02.1–13, N.D.C.C., the Association is given broad authority to govern and operate the state fair:

"*Bylaws, rules, regulations.* The state fair association may make all bylaws, ordinances, rules, and regulations, not inconsistent with law, which it may deem necessary or proper in carrying out the provisions of this chapter and for the government of the grounds on which the state fair is to be held, and for all fairs to be held thereon, and for the protection, health, safety, and comfort of the public.

Such bylaws, ordinances, rules, and regulations are in effect from the time of filing with the secretary of the association."

Under Article III, Section 1, of the North Dakota Constitution, the people of this state have reserved the power to propose and enact laws by the initiative process:

"While the legislative power of the state shall be vested in a legislative assembly consisting of a senate and a house of representatives, the people reserve the power to propose and enact laws by the initiative, including the call for a constitutional convention; to approve or reject legislative Acts, or parts thereof, by the referendum; to propose and adopt constitutional amendments by the initiative; and to recall certain elected officials. This article is self-executing and all of its provisions are mandatory. Laws may be enacted to facilitate and safeguard, but not to hamper, restrict, or impair these powers."

To initiate a law, a sponsoring committee of at least 25 electors must present a petition to the Secretary of State for approval as to its form and then circulate copies of the petition to obtain signatures of electors equal in number to two percent of the state's population. Art. III, §§ 2–4, N.D. Const.

In July 1992, Bolinske was chairman of the sponsoring committee to initiate a measure to create and fund an environmental protection and recycling fund and to impose a fee on the disposal or incineration of waste in this state. *See Municipal Services Corp. v. Kusler,* 490 N.W.2d 700 (N.D.1992). After his petition was approved by the Secretary of State, Bolinske attempted to circulate the petition at the state fair, to obtain the required number of signatures. However, the fair manager informed Bolinske that he would not be allowed to freely roam the fairgrounds to solicit signatures on petitions, but would be required to solicit signatures from a leased booth space, for a rental fee in an amount depending upon size and location of the space. Bolinske concedes that he refused to apply for a booth, but asserts none was available. Bolinske filed this lawsuit to enjoin the Association from restricting solicitation of signatures on initiative petitions at

the state fair. He was granted a temporary restraining order, allowing him to circulate petitions on the fairgrounds without restriction during the remaining two days of the 1992 fair.

Upon conclusion of the fair, the Association filed a motion, requesting dismissal of Bolinske's lawsuit. In support of its motion, the Association presented to the court its written regulations, governing solicitation and allocation of booth space at the state fair. The Association's rule on soliciting, as amended on July 21, 1992, says:

"No person, parties or organizations shall distribute any kind of literature, or gather signatures for petitions, other than from a paid concession location—no walking concessions nor gathering of signatures for petitions other than from a paid concession location will be allowed."

The Association's current policy regarding allocation of booth space, as adopted June 10, 1993, provides:

## "SALES OF EXHIBIT SPACE SELECTION CRITERIA

"I. In order to attract and maintain high-quality concessions and exhibits, it is the policy of the Fair Association to annually extend to the concessionaires and exhibitors from the prior year's state fair the opportunity to renew their space rental contracts for the next state fair. Space rental contract renewals are made on the basis of a renewal for the same space, purpose, products, and ownership as in the prior year. The Fair Association reserves the right not to renew any space rental contract where the concessionaire or exhibitor has violated any rule or regulation of the Fair Association or any state or federal law.

"II. As close to January 1 as is practical, the Fair Association will send renewal applications to concessionaires or exhibitors from the prior year's state fair. The applications must be returned within 30 days of mailing to assure timely processing of the renewal application.

"III. Application forms will be available and new applications for concession and exhibit space for the state fair shall be accepted by the Fair Association beginning on February 1 of each year. Space shall be rented to new applicants on a first-come, first-serve basis with the exception that fair management or its representatives shall limit the number of similar products being sold to an amount that permits reasonable sale opportunities. For example, state fair could sell 50 hot dog spaces but limits the number to 10 or 20. This exception applies only to commercial booths.

"IV. Concessionaires and exhibitors renewing space rental contracts and concessionaires and exhibitors entering into new space rental contracts must meet quality and standards requirements established by current Fair Association rules or regulations."

The trial court concluded these were reasonable regulations, imposed by the Association under its responsibility "to regulate the fair crowd and activities." The court concluded the restrictions on soliciting at the state fair did not violate Bolinske's constitutional right of free speech or his constitutional right to propose laws by the initiative process, and it granted the Association's motion, dismissing Bolinske's complaint with prejudice.

On appeal, Bolinske claims the Association's restrictions on circulating initiative petitions at the state fair violate his constitutional right of free speech and his constitutional right to initiate laws by the initiative process. The Association responds that these limitations upon the petitioning process are reasonable time, place, and manner restrictions, necessary for the safety and convenience of fair patrons and for maintenance of traffic flow at the state fair, to facilitate the statutory purposes and objectives of the fair.

■ The Association argues that Bolinske has no standing to assert that it acted arbitrarily in selecting renters, because Bolinske never applied to rent a booth. We disagree that Bolinske's failure to apply for a booth rental denies him standing to raise a First Amendment challenge to the Association's application of its regulations. State action can be challenged on overbreadth grounds

for its potential to chill or infringe free speech even though the challenger's rights may not have been violated under the circumstances. *Forsyth County, Ga. v. Nationalist Movement,* —— U.S. ——, 112 S.Ct. 2395, 120 L.Ed.2d 101 (1992); *see also State v. Anderson,* 427 N.W.2d 316 (N.D.) (footnote 1), *cert. denied,* 488 U.S. 965, 109 S.Ct. 491, 102 L.Ed.2d 528 (1988).

The Association also argues that Bolinske's issue about arbitrary application is moot, because effective relief cannot now be granted. However, the Association concedes that Bolinske's argument that the Association's current regulations are facially unconstitutional is a "live issue" and not moot. In this appeal, Bolinske does not request compensation or other relief for past actions of the Association. He merely requests a prospective declaration "that [i]nitiative [p]etitions may be freely circulated on public property."

■■■ An appeal is moot when an appellate court is unable to render effective relief due to the lapse of time or the occurrence of related events. *Pelkey v. City of Fargo,* 453 N.W.2d 801 (N.D.1990). However, we will not dismiss an appeal as moot if the controversy is one of great public interest and involves the authority and power of public officials, or where the matter is capable of repetition, yet evading review. *North Dakota Council of School Administrators v. Sinner,* 458 N.W.2d 280 (N.D.1990). The issues raised here are definitely capable of repetition without opportunity for review. The state fair is an annual event of short duration. The current regulations of the Association still require persons desiring to solicit signatures on initiative petitions to secure a rental space for that purpose. Whether those current regulations, on their face, violate constitutional rights of individuals, as alleged by Bolinske, is a viable question. The issue is of overriding public importance, because it presents potential conflict between a statutory agency's right to regulate public property to accomplish the purposes for which the property was acquired, (i.e., to operate an annual state fair) against private citizens' constitutional rights of free speech and of proposing laws by the initiative process. The issue, as raised by Bolinske and for the relief requested, is not moot. It is an issue of great public interest, and we address it here. *See, e.g., Pelkey v. City of Fargo,* 453 N.W.2d 801 (N.D.1990).

The First Amendment of the United States Constitution provides that "[c]ongress shall make no law ... abridging the freedom of speech...." This freedom of speech is among the fundamental personal rights and liberties which are also secured to all persons by the Fourteenth Amendment against abridgment by the states. *Thornhill v. State of Alabama,* 310 U.S. 88, 60 S.Ct. 736, 84 L.Ed. 1093 (1940). Bolinske asserts that his First Amendment rights of free speech are violated by the Association's regulation, which prohibits freely circulating initiative petitions for signatures on the state fairgrounds and which limits such activity to leased booth spaces at the fair.[1]

■■■ The guarantee of free speech under the First Amendment is a guarantee only against abridgment by government, federal or state; it provides no protection against infringement by a private corporation or person. *Hudgens v. National Labor Relations Board,* 424 U.S. 507, 96 S.Ct. 1029, 47

---

1. Article I, Section 5, of the North Dakota Constitution, provides:

"The citizens have a right, in a peaceable manner, to assemble together for the common good, and to apply to those invested with the powers of government for the redress of grievances, or for other proper purposes, by petition, address or remonstrance."

Bolinske asserts that this provision, as well as his free speech rights under the federal constitution, has been violated by the Association's regulations. However, other than a mere allegation that this state constitutional right has been violated, Bolinske makes no attempt to argue, analyze, or cite authorities to support his assertion. All legislative enactments are imbued with a strong presumption of constitutionality, and the presumption is conclusive unless it is clearly shown that the statute contravenes the state or federal constitution. *North Dakota Council of School Administrators v. Sinner,* 458 N.W.2d 280 (N.D. 1990). Bolinske's argument focuses entirely upon the federal constitution. We have repeatedly said that a party raising a constitutional challenge must bring up the heavy artillery or forego the attack entirely. *See, e.g., Swenson v. Northern Crop Ins., Inc.,* 498 N.W.2d 174 (N.D. 1993). We conclude that the state constitutional argument is inadequately raised, and we will not separately address it.

L.Ed.2d 196 (1976). The Association is an agency created by state statute, and it operates the state fair on public property. There is no dispute that the actions of the Association constitute state action. There is also no dispute that the activity of soliciting signatures on an initiative petition involves protected speech under the First Amendment. The circulation of initiative petitions equates with political expression, an activity guaranteed and protected by the First Amendment. *Hardie v. Fong Eu*, 18 Cal.3d 371, 134 Cal. Rptr. 201, 556 P.2d 301 (1976), *cert. denied*, 430 U.S. 969, 97 S.Ct. 1652, 52 L.Ed.2d 360 (1977).

■ *Meyer v. Grant*, 486 U.S. 414, 421–422, 108 S.Ct. 1886, 1891–1892, 100 L.Ed.2d 425, 434–435 (1988), involved the circulation of petitions to amend Colorado's constitution and to deregulate its trucking industry. The United States Supreme Court recognized the petition process as a highly protected form of expressive activity:

> "The circulation of an initiative petition of necessity involves both the expression of a desire for political change and a discussion of the merits of the proposed change. Although a petition circulator may not have to persuade potential signatories that a particular proposal should prevail to capture their signatures, he or she will at least have to persuade them that the matter is one deserving of the public scrutiny and debate that would attend its consideration by the whole electorate. This will in almost every case involve an explanation of the nature of the proposal and why its advocates support it. Thus, the circulation of a petition involves the type of interactive communication concerning political change that is appropriately described as 'core political speech.'"

But, the federal constitution does not guarantee the right to communicate one's views at all times and places or in any manner desired. *Fargo Women's Health Organization, Inc. v. Lambs of Christ*, 488 N.W.2d 401 (N.D.1992). The First Amendment does not require the government to freely grant access to all who wish to exercise free speech on every type of governmental property, without regard to the nature of the property or to the disruption that might be caused by the speaker's activities. *Cornelius v. NAACP Legal Defense and Educational Fund, Inc.*, 473 U.S. 788, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985). Even speech involving the discussion of governmental affairs, the essence of self-government, exercised in "quintessential public forums" such as parks and sidewalks, may interfere with other important activities for which that public property is used, and the government may regulate the time, place, and manner of that expressive activity. *Burson v. Freeman*, —— U.S. ——, ——, 112 S.Ct. 1846, 1850, 119 L.Ed.2d 5, 13 (1992).

■ The United State's Supreme Court has adopted a forum analysis for balancing the government's interest in limiting the use of its property to its intended purpose and the interests of those wanting to use the property for expressive activity and other purposes. Quoting Justice O'Connor in *Bd of Airport Comm'rs. v. Jews for Jesus, Inc.*, 482 U.S. 569, 572–573, 107 S.Ct. 2568, 2571, 96 L.Ed.2d 500, 506 (1987), we highlighted this forum analysis in *City of Jamestown v. Beneda*, 477 N.W.2d 830, 837 (N.D.1991):

> "[T]he Court has identified three types of fora: the traditional public forum, the public forum created by government designation, and the nonpublic forum. *Perry Ed. Assn v. Perry Local Educators' Assn*, 460 U.S. 37, 45–46, 103 S.Ct. 948, 954–955, 74 L.Ed.2d 794 (1983). The proper First Amendment analysis differs depending on whether the area in question falls in one category rather than another. In a traditional public forum or a public forum by government designation, we have held that First Amendment protections are subject to heightened scrutiny:

> " ' "In these quintessential public forums, the government may not prohibit all communicative activity. For the State to enforce a content-based exclusion it must show that its regulation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end.... The State may also enforce regulations of the time, place, and manner of expression which are content-neutral, are narrowly tailored to serve a significant

government interest, and leave open ample alternative channels of communication.'" Id., at 45, 103 S.Ct., at 955.

" 'We have further held, however, that access to a nonpublic forum may be restricted by government regulation as long as the regulation "is reasonable and not an effort to suppress expression merely because officials oppose the speaker's view." '" Id., at 46, 103 S.Ct., at 955.

■ A key component in analyzing the validity of the Association's regulation under the First Amendment is the specialized nature of the public forum involved here. The state fair is a special annual event of very limited duration, with a specific objective of providing thousands of attendees a wide variety of information and entertainment. When public property is being used for a specific purpose, theme, or event, individualized First Amendment expression is often subject to limitation and regulation to accommodate the purpose or objective of the event. See Paulsen v. Gotbaum, 982 F.2d 825 (2d Cir.1992) (rule limiting leaflet distribution to a specific area during special events in city park was a valid time, place, and manner restriction); Hynes v. Metropolitan Government of Nashville and Davidson County, 667 F.2d 549 (6th Cir.1982) (Tennessee State Fair rule prohibiting literature distribution and solicitation of funds on the fairgrounds did not violate the First Amendment).

■ A significant opinion, instructive to our resolution of this issue, is Heffron v. International Society for Krishna Consciousness, Inc., 452 U.S. 640, 101 S.Ct. 2559, 69 L.Ed.2d 298 (1981), a case very similar to this case, both factually and legally. Heffron involved a religious group (ISKCON) that wanted to distribute and sell religious materials and solicit donations for its organization at the Minnesota State Fair. That fair is very similar to ours, with a statutory purpose of exhibiting agricultural, mining, industrial, and other products and resources of the state. M.S.A. § 37.01. The Minnesota Agricultural Society, a public corporation which operates the Minnesota State Fair, promulgated a rule (Rule 6.05), precluding any person or organization from distributing or selling literature or soliciting donations at the

fair, other than from a licensed, leased exhibit space. The issue in Heffron was whether that rule constituted a permissible time, place, and manner restriction on ISKCON's protected First Amendment activities.

The United States Supreme Court first determined what type of forum the Minnesota State Fair represented:

> "The Minnesota State Fair is a limited public forum in that it exists to provide a means for a great number of exhibitors temporarily to present their products or views, be they commercial, religious, or political, to a large number of people in an efficient fashion."

Heffron, supra, 452 U.S. at 655, 101 S.Ct. at 2567–2568, 69 L.Ed.2d at 311. The Court concluded that ISKCON had rights to communicate, distribute, and solicit on the fairgrounds, which were neither greater nor less than the same rights of other organizations having social, political, or other ideological messages to communicate. It concluded that ISKCON's protected First Amendment activity was subject to reasonable time, place, and manner restrictions and that a rule restricting ISKCON's solicitation and distribution activities to a licensed location would not offend the First Amendment, providing the rule was content neutral, served a significant governmental interest, and left open ample alternative channels of communication. The Court concluded that the Minnesota rule met these criteria and constituted a valid time, place, and manner regulation.

Because the Heffron Court's analysis of these criteria not only informs, but also preordains our analysis of the Association's regulation in this case, we set out the relevant principles:

> "A major criterion for a valid time, place and manner restriction is that the restriction 'may not be based upon either the content or subject matter of speech.' ... Rule 6.05 qualifies in this respect.... [T]he Rule applies evenhandedly to all who wish to distribute and sell written materials or to solicit funds. No person or organization, whether commercial or charitable, is permitted to engage in such activities

except from a booth rented for those purposes.

\*   \*   \*   \*   \*   \*

"The method of allocating space is a straightforward first-come, first-served system. The Rule is not open to the kind of arbitrary application that this Court has condemned as inherently inconsistent with a valid time, place, and manner regulation because such discretion has the potential for becoming a means of suppressing a particular point of view.

\*   \*   \*   \*   \*   \*

"A valid time, place, and manner regulation must also 'serve a significant governmental interest.' ... Here, the principal justification asserted by the State in support of Rule 6.05 is the need to maintain the orderly movement of the crowd given the large number of exhibitors and persons attending the Fair.

\*   \*   \*   \*   \*   \*

"The Fair is designed to exhibit to the public an enormous variety of goods, services, entertainment, and other matters of interest. This is accomplished by confining individual exhibitors to fixed locations, with the public moving to and among the booths or other attractions, using streets and open spaces provided for that purpose. Because the Fair attracts large crowds ... it is apparent that the State's interest in the orderly movement and control of such an assembly of persons is a substantial consideration.

\*   \*   \*   \*   \*   \*

"Given these considerations, we hold that the State's interest in confining distribution, selling, and fund solicitation activities to fixed locations is sufficient to satisfy the requirement that a place or manner restriction must serve a substantial state interest.... In our view, the Society may apply its Rule and confine the type of transactions at issue to designated locations without violating the First Amendment.

"For similar reasons, we cannot agree with the Minnesota Supreme Court that Rule 6.05 is an unnecessary regulation be-

cause the State could avoid the threat to its interest posed by ISKCON by less restrictive means, such as penalizing disorder or disruption, limiting the number of solicitors, or putting more narrowly drawn restrictions on the location and movement of ISKCON's representatives. As we have indicated, the inquiry must involve not only ISKCON, but also all other organizations that would be entitled to distribute, sell, or solicit if the booth rule may not be enforced with respect to ISKCON. Looked at in this way, it is quite improbable that the alternative means suggested by the Minnesota Supreme Court would deal adequately with the problems posed by the much larger number of distributors and solicitors that would be present on the fairgrounds if the judgment below were affirmed.

"For Rule 6.05 to be valid as a place and manner restriction, it must also be sufficiently clear that alternative forums for the expression of respondents' protected speech exist despite the effects of the Rule. Rule 6.05 is not vulnerable on this ground. First, the Rule does not prevent ISKCON from practicing Sankirtan anywhere outside the fairgrounds. More importantly, the Rule has not been shown to deny access within the forum in question. Here, the Rule does not exclude ISKCON from the fairgrounds, nor does it deny that organization the right to conduct any desired activity at some point within the forum. Its members may mingle with the crowd and orally propagate their views. The organization may also arrange for a booth and distribute and sell literature and solicit funds from that location on the fairgrounds itself."

*Heffron, supra,* 452 U.S. at 648–655, 101 S.Ct. at 2564–2568, 69 L.Ed.2d at 307–311.

The applicability of the Court's analysis in *Heffron* to the challenged regulation of the Association in this case is readily apparent.

The Association's regulation is content neutral. It applies to all persons and organizations desiring to distribute literature of any kind or gather signatures for any petitions at the state fair. Although persons leasing booths have first opportunity to renew their

rentals for another year, all spaces rented to new applicants are on a first-come, first-serve basis. The only exception, not relevant to the circumstances here, is that management can choose to limit the number of similar products being sold at the fair. The regulation does not allow selection of exhibitors based upon content of expression or purpose of the exhibit. *Compare Capital Area Right to Life, Inc. v. Downtown Frankfort, Inc.,* 862 S.W.2d ·297 (Ky.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 2132, 128 L.Ed.2d 863 (1994) and —— U.S. ——, 114 S.Ct. 2153, 128 L.Ed.2d 878 (1994) (participation at "Great Pumpkin Festival" limited to activities consistent with and appropriate to the festival's theme and purpose). We conclude the Association's regulation meets the first requirement of time, place, and manner restrictions, content-neutrality.

A valid time, place, and manner restriction must also serve a significant governmental interest. The interest advanced by the Association in this case is nearly identical to the governmental interest advocated in *Heffron.* The Association asserts that it must limit literature distribution and petition circulation to defined locations to control the flow of the crowds and to provide a safe and orderly environment for fair patrons. The state fair is held each year during July in Minot for about nine days on 164 acres controlled by the Association. The fair attracts persons from this state and others, and during the past ten years, the average annual attendance at the fair has been about 250,000 people. There are approximately 321 indoor booths and 300 outdoor booths that are rented by the Association at the fair to concessionaires or exhibitors.

In this type of environment, solicitation, whether for donations or signatures, can have a disruptive effect on the flow of traffic, because it requires action by those who would respond. *See International Society for Krishna Consciousness, Inc. v. Lee,* —— U.S. ——, ——, 112 S.Ct. 2701, 2708, 120 L.Ed.2d 541 (1992). The process of soliciting signatures requires discussion on the merits of the measure proposed with each person

approached to sign. The process invites a response, which may entail a reading of the measure, additional discussion, and eventual signing of the petition. Thus, the petition circulation process may result in substantial disruption of fair patrons, especially if numerous petitioners choose to use the fair as a place for soliciting signatures. We believe the Association's interest in protecting the convenience of fair patrons and controlling the activities and the flow of traffic at the fair justifies limiting solicitation of signatures on petitions to defined locations.

A regulation restricting protected expression must also leave open ample alternative channels for communication. Nothing in the Association's regulation attempts to prohibit or restrict a person's activity in soliciting signatures for a petition outside the fairgrounds. Furthermore, the regulation does not attempt to prohibit any person from freely communicating with others while on the fairgrounds. The Association's regulation does not preclude Bolinske or others from visiting, communicating, and discussing petition issues with others anywhere on the fairgrounds. The Association concedes in its appellate brief that Bolinske, in accord with its regulation, "may also mingle with the crowd and orally propagate his political views." Only the process of actually gathering signatures on the petitions is limited to leased booth spaces.

We hold that the Association's regulation, restricting the solicitation of signatures for petitions to leased concession locations, constitutes a reasonable time, place, and manner restriction and does not violate the First Amendment.

Bolinske asserts that the fee or rent charged by the Association for booth space "restricts, impairs, and hampers the ability to obtain the required number of signatures" and that it has a "chilling effect on citizens unable to afford it." [2]

In *Cox v. State of New Hampshire,* 312 U.S. 569, 576–577, 61 S.Ct. 762, 766, 85 L.Ed. 1049, 1054 (1941), the United States Supreme Court upheld, against First Amendment at-

---

**2.** In *Heffron, supra,* 452 U.S. at 660, 101 S.Ct. at 2562, 69 L.Ed.2d at 314, the propriety of the fee

charged for leasing a booth at the Minnesota State Fair was not an issue.

tack, a fee imposed by a municipality for a parade permit:

"There remains the question of license fees which, as the court said, had a permissible range from $300 to a nominal amount.... The fee was held to be 'not a revenue tax, but one to meet the expense incident to the administration of the act and to the maintenance of public order in the matter licensed.' There is nothing contrary to the Constitution in the charge of a fee limited to the purpose stated."

Two years later the Court clarified its views on fees affecting First Amendment activity, when it struck down a city ordinance which, as construed and applied, required a religious organization to pay a flat license tax as a precondition to door-to-door distribution of literature and solicitation of funds. *Murdock v. Commonwealth of Pennsylvania*, 319 U.S. 105, 63 S.Ct. 870, 87 L.Ed. 1292 (1943). The Court, in an opinion delivered by Justice William Douglas, invalidated the license fee because, unlike the fee in *Cox, supra*, it was a charge imposed upon the enjoyment of First Amendment rights and not a regulatory measure calculated to defray the expense of protecting persons on the streets or at home against the abuses of solicitors.

The Court again revisited the issue of imposing fees on protected First Amendment activity in *Forsyth County, Ga. v. Nationalist Movement*, — U.S. —, 112 S.Ct. 2395, 120 L.Ed.2d 101 (1992). In that case, a county enacted an ordinance requiring payment of a fee for a permit to conduct a parade, demonstration, or other use of public property. The fee was enacted to defray the law enforcement and administrative cost associated with those events. The Court struck down the ordinance, because it was not narrowly drawn with reasonable and definite standards to guide the county's administrator in setting the amount of the fee. The Court concluded that under the ordinance, the decision of how much to charge, or whether to charge any fee at all, was left to the unbridled discretion of the administrator. The Court also concluded that the ordinance was unconstitutionally content-based, because it required the administrator to assess the cost of providing security for the parade

or other protected activity, based upon the content of the message conveyed and the estimated public response to that content.

■ These cases demonstrate that not all fees affecting protected expression are per se unconstitutional. The United States Supreme Court has utilized a case-by-case analysis of such fees, and it closely examines in each case, the purpose and structure of the fee imposed. Content-neutral fees, imposed to defray legitimate costs associated with operating a public forum or the specific event involved, are not unconstitutional merely because they may have an incidental effect on the exercise of protected speech.

■ Here, the Association leases about 321 indoor booths and 300 outdoor booths at each annual fair. The fee is between $100 and $380, depending upon size and location of the space. In raising this issue, Bolinske has merely asserted that the exercise of free speech should not be subject to a fee. He has cited no authorities in support of his position, and he has made no attempt to analyze caselaw relevant to this issue. Bolinske has submitted no facts by affidavit, or otherwise, to show how the booth rentals were set by the Association. Furthermore, Bolinske has not alleged that there is a factual question about the Association's fees, their nature, the purpose for which they are imposed, or whether they exceed the constitutional parameters for imposing fees on protected First Amendment activity as pronounced by the United States Supreme Court in *Cox, Murdock*, and, most recently, in *Forsyth County*.

In *Jacobsen v. Crivaro*, 851 F.2d 1067 (8th Cir.1988), a newspaper publisher asserted that a local ordinance which imposed a $10 annual licensing fee for each newsrack used to sell newspapers violated his First Amendment free speech rights. The Eighth Circuit Court of Appeals held that fees which cover only the administrative costs of the license are permissible. The Court also concluded that summary judgment dismissing the claim was appropriate, because the publisher had failed to demonstrate there was a factual question about whether the city's fees were proper in purpose and amount. Like the

publisher in *Jacobsen, supra,* Bolinske has failed to assert that there is a genuine question of material fact regarding the fees he attacks.

*Gannett Satellite Info. Network, Inc. v. Metro. Transp. Auth.,* 745 F.2d 767 (2d Cir. 1984), is also instructive on the question of the appropriateness of the booth rentals levied by the Association. In *Gannett,* a transportation authority, operating a commuter railroad line, imposed fees on racks for newspaper sales placed in the train stations. A newspaper publisher attacked the fees as violating its First Amendment rights. The Second Circuit Court of Appeals concluded that the commuter stations were appropriate fora for newspaper sales, but that the transit authority could place reasonable time, place, and manner restrictions on newsrack placement. The circuit court also concluded that the fees, which were instituted to raise revenue to operate the commuter lines, constituted permissible regulation:

"Ordinarily, a government cannot profit by imposing licensing or permit fees on the exercise of a First Amendment right. *Murdock v. Pennsylvania,* 319 U.S. 105, 113–14, 63 S.Ct. 870, 875–76, 87 L.Ed. 1292 (1943); *Cox v. New Hampshire,* 312 U.S. 569, 577, 61 S.Ct. 762, 766, 85 L.Ed. 1049 (1941); *Hull v. Petrillo,* 439 F.2d 1184, 1186 (2d Cir.1971). Only fees that cover the administrative costs of the permit or license are permissible. [*Eastern Connecticut Citizens Action Group v. Powers,* 723 F.2d 1050, 1056 (2d Cir.1983)]. In those cases in which licensing fees were prohibited, however, the government was acting in a governmental capacity and was raising general revenue under the guise of defraying its administrative costs.

\*     \*     \*     \*     \*     \*

"In imposing licensing fees, MTA is not acting in a traditional governmental capacity. Although the state's purpose in acquiring and operating the railroads is to preserve the state's economy by providing efficient commuter passenger service, N.Y.Pub.Auth.Law § 1264 (McKinney 1982) ('essential governmental function'), the management of station facilities is a proprietary, not a governmental function.

\*     \*     \*     \*     \*     \*

"When a government agency is engaged in a commercial enterprise, the raising of revenue is a significant interest.

\*     \*     \*     \*     \*     \*

"If MTA's licensing fees for Gannett's newsracks were found unconstitutional, its revenues from other businesses within the ambit of First Amendment protections, for example, advertising, newsstands and other distributors' newsracks, would be endangered. Thus, the effect on MTA's revenue raising interest would be substantial.

"Consequently, the licensing fees are permissible manner restrictions which serve the significant governmental interest of raising revenue for the self-sufficient, efficient operation of commuter lines."

*Gannett, supra,* 745 F.2d at 774–775.

The North Dakota State Fair, like the commuter line in *Gannett,* is a type of commercial enterprise or proprietary function. The state fair is a limited public forum, whose survival depends upon generating sufficient revenue to cover its annual operating costs. The revenue the Association generates from each fair provides the means for it to continue sponsoring annual fairs. Bolinske has failed to present a factual argument that the Association's fees are excessive or imposed for impermissible purposes. Under these circumstances, we are unpersuaded that the Association's booth rental charges are unconstitutional.

■ Article III, Section 1, of the North Dakota Constitution states, "Laws may be enacted to facilitate and safeguard, but not to hamper, restrict, or impair these powers." Bolinske asserts that by limiting his right to circulate initiative petitions at the state fair, the Association is hampering, restricting, or impairing his power to propose laws by the initiative process.

Since 1918, equivalent language to that quoted above has been part of our State Constitution. Article amend. 26, approved Nov. 5, 1918 (S.L.1919, Ch. 88). Its mandate is clear that the Legislature can only enact

laws which facilitate, not impair, the reserved power of the people to initiate or refer laws. *Hernett v. Meier,* 173 N.W.2d 907, 911 (N.D. 1970). However, the power of the people to refer and initiate laws is not absolute; it is subject to reasonable regulation through laws meant to facilitate those powers. *Wood v. Byrne,* 60 N.D. 1, 232 N.W. 303 (1930). In *Wood,* sponsors of an initiated measure attacked a statute requiring each copy of an initiative petition to have attached to it an affidavit, vouching that each signature on it was genuine and that each person signing the petition was a qualified elector. The initiative sponsors claimed this legislation hampered, restricted, or impaired the power of the people to initiate laws, and violated the state constitution. This court concluded that the statute served to facilitate, not hamper, the people's power of initiative:

> "The statutory requirement that 'each copy of any such petition before being filed must have attached thereto an affidavit to the effect that each signature to the paper ·appended is the genuine signature of the person whose name it purports to be, and that each such person is a qualified elector' does not hamper, restrict, or impair the exercise of the rights reserved to the people by the Constitution, if such affidavit is made on information and belief. Any person who circulates a copy of a petition in any neighborhood, or any person who has information upon which he can form a belief, can make such an affidavit in compliance with the statute as we construe it, and, *as so construed, it is a reasonable constitutional regulation and a valid statute.*" (Emphasis added.)

*Wood,* 232 N.W. at 306. *See also Dawson v. Meier,* 78 N.W.2d 420 (N.D.1956) (statute requiring petition signatures to include signer's address and date of signing was intended to safeguard and facilitate initiative process and was reasonable regulation).

▮ The Association's regulation does not, in our view, unconstitutionally hamper, restrict, or impair the power of the people to initiate. Rather, it structures and accommodates the petition circulation process at the state fair together with all of the other activities simultaneously occurring there. The Association's regulation allows fair patrons to be approached anywhere on the fairgrounds by petitioners to discuss their causes. The person approached then has the option, at his or her convenience, to visit the petitioner's booth to read, discuss, and perhaps sign the petition.

Bolinske cites no authority to support his implicit argument that the right to circulate initiative petitions at the state fair must be absolute and free from any reasonable conditions upon the time, place, or manner of conducting that activity. Even political expression, one of the highest forms of protected free speech, being exercised in quintessential public fora such as parks and public sidewalks, is subject to reasonable time, place, and manner regulations. *Burson, supra.* In the absence of any authority to persuade us otherwise, we refuse Bolinske's invitation to interpret Article III, Section 1, of the North Dakota Constitution, as prohibiting any regulation of the initiative process on public property. To do so would place that activity on a higher plane than all other forms of constitutionally protected expression. The plain language of Article III, Section 1, does not mandate that result.

Recognizing that the state fair is a limited public forum of short duration with multiple objectives, we conclude that the Association's regulation of the circulation of petitions at the fair is a reasonable regulation of the petition process, which accommodates and facilitates the people's reserved power of initiative.

The summary judgment dismissing Bolinske's claim for a permanent injunction is affirmed.

VANDE WALLE, C.J., and NEUMANN and MESCHKE, JJ., concur.

SANDSTROM, Justice, dissenting.

Financially supported by the state legislature,[1] the North Dakota State Fair Association seeks to block quiet and peaceful actions of those who would lawfully override deci-

---

**1.** *See e.g.,* 1993 N.D.Sess.Laws, ch. 32, § 1, and ch. 32; 1991 N.D.Sess.Laws, ch. 13.

sions of the legislature. The majority finds this state action "reasonable." I do not.

The right to free speech, the right to peaceably assemble and petition the government for redress of grievances, and the state constitutional rights of initiative and referendum are part of the fabric of our liberty. The majority too easily permits state action to tear that fabric.

The majority says *Heffron v. International Society of Krishna Consciousness, Inc.,* 452 U.S. 640, 101 S.Ct. 2559, 69 L.Ed.2d 298 (1981), "preordains our analysis of the Association's regulation in this case." It does not. True, both *Heffron* and this case involve state fairs. The *Heffron* rules, however, were content neutral, while the rules in this case are not.

In *Heffron,* "the Rule applies evenhandedly to all who wish to distribute and sell written materials or to solicit funds. No person or organization, whether commercial or charitable, is permitted to engage in such activities except from a booth rented for those purposes." *Heffron,* 452 U.S. at 649, 101 S.Ct. at 2565, 69 L.Ed.2d at 307. The Court specifically noted "the Rule does not prevent organizational representatives from walking about the fairgrounds and communicating the organization's views with fair patrons...." *Heffron,* 452 U.S. at 643–44, 101 S.Ct. at 2562, 69 L.Ed.2d at 304.

In this case, the Association's rule regulates distribution of literature and concessions—on their face, content-neutral regulations. Unlike *Heffron,* there is no prohibition on solicitation of funds—a rule held content neutral because funds could be solicited for all causes and purposes. Much like in *Heffron,* the Association's regulations allow fair patrons to be approached anywhere on the fairgrounds by any person to discuss any views, causes or beliefs. But then the Association crosses the line by singling out "the gathering of signatures for petitions"—a re-

striction not contained in *Heffron,* and not content neutral.

As the United States Supreme Court said in *Meyer v. Grant,* 486 U.S. 414, 421, 108 S.Ct. 1886, 1891, 100 L.Ed.2d 425, 434 (1988), "The circulation of an initiative petition of necessity involves ... the expression of a desire for political change...." The Association has singled out " 'core political speech,' " *Meyer,* 486 U.S. at 422, 108 S.Ct. at 1892, 100 L.Ed.2d at 435, circulating initiative and referendum petitions, engaged in by those having a specific set of views—a desire to change the action or inaction of the legislature.[2]

The Court of Appeals for the Eighth Circuit recently struck down provisions of Minnesota statutes:

"Section 10A.25 subd. 13 singles out particular political speech—that which advocates the defeat of a candidate and/or supports the election of her opponents—for negative treatment that the state applies to no other variety of speech.... We have no difficulty concluding that this is a statute that 'by [its] terms distinguish[es] favored speech from disfavored speech on the basis of the ideas or views expressed,' and thus it cannot by content-neutral. *Turner Broadcasting System Inc. v. F.C.C.,* —— U.S. ——, ——, 114 S.Ct. [2445] at 2459 [129 L.Ed.2d 497]."

*Day v. Holahan,* 34 F.3d 1356, 1361 (8th Cir.1994). As in *Day,* the rule singles out particular political speech—that which would change the legislature's action or inaction.

The Association asserts its rule is narrowly drawn to serve a compelling state interest— protecting the safety and convenience of fairgoers, and avoiding disruption. Yet the evidence before the trial court clearly reflects that no disruption, safety or convenience problems arose during the two days the Temporary Restraining Order allowed the

---

**2.** The term "petitions" is clearly used by the Association to identify those circulated for initiative or referendum. They are the ones primarily affected as they need thousands of signatures, as opposed to the handful to a few hundred signatures needed to place a candidate's name on the ballot. *See e.g.,* N.D.Const., Art. III, § 4;

N.D.C.C. §§ 16.1–11–06(2)(c), and 16.1–11–11(2)(c). Even in the case of candidates, the "outsiders" who must petition are treated differently than political party candidates who are routinely placed on the ballot by certificate of endorsement. *See* N.D.C.C. §§ 16.1–11–06, and 16.1–11–11.

gathering of signatures anywhere on the fair-grounds.

The Association stipulates that fair patrons can be approached anywhere, and the petitions discussed anywhere. The Association fails to establish how a greater problem would be created by allowing those who can be approached anywhere, to sign anywhere.

In the words of the Eighth Circuit, the restriction "is assuredly *not* 'necessary to serve the asserted interest.'" *Day*, at 1362 (quoting *Burson v. Freeman*, 504 U.S. ——, ——, 112 S.Ct. 1846, 1852, 119 L.Ed.2d 5, 15 (1992)).

The restriction on the gathering of signatures for petitions, is conceded as government action, affects core political speech, is not content neutral, and should properly be lifted. I would reverse.