2008 ND 104

**ALERUS FINANCIAL, N.A., and S. Luther Simonson, as Trustees of the Robert F. Fritz Living Trust, Plaintiffs and Appellants**

v.

**WESTERN STATE BANK and A.G. Edwards & Sons, Inc., corporations, Defendants and Appellees.**

No. 20070066.

Supreme Court of North Dakota.

June 5, 2008.

Stephen F. Rufer, Pemberton, Sorlie, Rufer and Kershner, P.L.L.P., Fergus Falls, MN, for plaintiffs and appellants.

Roger James Minch, Fargo, N.D., for defendant and appellee Western State Bank.

Ronald H. McLean (argued) and Jane L. Dynes (on brief), Fargo, N.D. for defendant and appellee A.G. Edwards & Sons, Inc.

CROTHERS, Justice.

[¶ 1] Alerus Financial, N.A., and S. Luther Simonson, the current successor trustees of the Robert F. Fritz Living Trust ("Trustees"), appeal from a summary judgment granted to Western State Bank and A.G. Edwards & Sons, Inc. We conclude the district court did not err in granting A.G. Edwards summary judgment because the Trustees failed to raise a genuine issue of material fact that former trustee Dale Gifford was not authorized to withdraw trust assets from the trust's accounts with A.G. Edwards under a general power of attorney and a trust agreement. We conclude, however, the court erred in granting Western State Bank summary judgment because genuine issues of material fact exist about liability in connection with Gifford's transactions with Western State Bank. We affirm in part, reverse in part, and remand for further proceedings.

## I.

[¶ 2] This case arises out of the Trustees' attempts to recover damages from Western State Bank and from A.G. Edwards for trust funds used for personal benefit by Gifford, a former co-trustee and also attorney-in-fact under a power of attorney executed by Robert F. Fritz.

[¶ 3] In 1992, Fritz, as grantor, established a revocable living trust, appointing himself as sole trustee and naming Lyall Engebretson and Simonson as successor trustees. Fritz initially acted as trustee and reserved the right to revoke or amend the trust. The bulk of the trust's investments were held in an investment account with A.G. Edwards, and sometime after the trust was created, A.G. Edwards' legal counsel reviewed the trust documents.

[¶ 4] Fritz first amended the trust in March 1996, again reserving his grantor's right to revoke or amend the trust. The first amended trust did not change the designated successor trustees, Engebretson and Simonson. The first amended trust authorized the successor trustees to act jointly in the event of Fritz's death, or his physical or mental incapacity, and if either successor trustee failed or ceased to act as trustee for any reason, the remaining successor trustee was authorized to act alone as successor trustee.

[¶ 5] The trust agreement included "safe harbor" language in "Article Twelfth" addressing third-party liability in dealing with any trustee:

"No person who deals with any Trustee hereunder shall be bound to see to the application of any asset delivered to such Trustee or to inquire into the authority for, or propriety of, any action taken or not taken by such Trustee."

"Article Thirteenth" of the trust agreement was entitled "Third Parties Not Responsible For Administration" and stated:

"This trust is created with the express understanding that each bank at which an account is maintained shall have no

responsibility as a depository of funds to see to the proper administration of this trust. Upon the transfer of the right, title and interest in and to any account by any Trustee hereunder, the bank shall conclusively treat the transferee as the sole owner of such right, title and interest. Until the bank shall receive from some person interested in this trust written notice of any death or other event upon which a right to receive income or principal may depend, *the bank shall incur no liability for payment made in good faith* to persons whose interests shall have been affected by such event. The bank shall be protected in acting upon any notice or other instrument or document believed by it to be genuine and to have been signed or presented by the proper party or parties.

"This trust is created with the express understanding that each issuer, transfer agent or custodian of any securities held hereunder shall have no responsibility or liability to see to the proper administration of this trust. Upon the transfer of the right, title and interest in and to such securities by any trustee hereunder, said issuer, transfer agent or custodian shall conclusively treat the transferee as the sole owner of such securities. Until the issuer, transfer agent or custodian shall receive from some person interested in this trust written notice of any death or other event upon which a right to receive income or principal may depend, *the issuer, transfer agent or custodian shall incur no liability for payment made in good faith* to persons whose interests shall have been affected by such event. The issuer, transfer agent or custodian shall be protected in acting upon any notice or other instrument or document believed by it to be genuine and to have

been signed or presented by the proper party or parties."

(Emphasis added.)

[¶ 6] In September 1996, Fritz executed a general power of attorney that appointed Simonson and Gifford, or either of them, as Fritz's attorneys-in-fact to act "separately in [Fritz's] name, place and stead in any way which [Fritz] could do, if [he] were personally present, to the extent that [he is] permitted by law to act through an agent...." During that time frame, Fritz also named Simonson and Gifford as personal representatives under his will and as health care agents in his living will. Under the power of attorney, either Simonson or Gifford, as Fritz's attorneys-in-fact, were granted a number of broad powers, including:

"(b) to make, execute, indorse, accept and deliver in my name or in the name of my attorneys-in-fact all checks, notes, drafts, warrants, securities, stock certificates, certificates of deposit, bonds, acknowledgments, and any other agreements, certificates or instruments of any nature, as my attorneys-in-fact may deem necessary or appropriate;

. . . .

"(d) to deposit and withdraw any sums to or from any bank, savings or similar account maintained by me; ... and to conduct such other banking transactions as my attorneys-in-fact may deem necessary or appropriate;

. . . .

"(g) to create, amend or terminate one or more trusts, ... or any other form of ownership or entity for the purpose of dealing with any property or property interest of any nature that I may have or hereafter acquire, under such terms and with such provisions as my attorneys-in-fact may deem necessary or appropriate; and to transfer any or all property in which I have an interest into

any trusts, ... or other entities, whether created by me or my attorneys-in-fact or otherwise (and, in this regard, that my attorneys-in-fact may be a remainderman, partner, shareholder, co-tenant or beneficiary of any such entity shall not affect the validity of any action hereunder, and shall not, by itself, constitute a breach of fiduciary duty); and to remove property from any such entity; and to give to any such entity, or to any person acting as agent or trustee under any instrument executed by me or on my behalf, such instructions or authorizations as I may have the right to give;

. . . .

"(n) to do, execute, perform and finish for me and in my name all things which my attorneys-in-fact shall deem necessary or appropriate, in and about or concerning my property or any part thereof.

. . . .

"In addition, I specifically authorize my attorneys-in-fact to transfer any property or funds to the trustees of the following trust: Robert F. Fritz Living Trust, dated October 27, 1992."

The power of attorney also included a clause protecting third parties who acted after receiving and relying on a copy of the power of attorney:

"To induce any third party to act hereunder, I hereby agree that any third party receiving a duly executed copy or facsimile of this power of attorney may act hereunder, and that revocation or termination hereof shall be ineffective as to such third party unless and until actual notice or knowledge of such revocation or termination shall have been received by such third party. I, for myself and my heirs, executors, legal representatives and assigns, hereby agree to indemnify and hold harmless any such third party from and against any and all claims that may arise against such third party by reason of reliance upon the provisions of this power of attorney."

[¶ 7] In December 1998, Fritz personally executed a second amendment to the trust, again designating himself as sole trustee, but naming Gifford and Simonson as successor trustees with the power to act jointly in the event of Fritz's death or physical or mental incapacity, and if either Simonson or Gifford failed or ceased to act as trustee, the other was authorized to act alone as successor trustee.

[¶ 8] In either late 1999 or early 2000, Gifford and Simonson, along with trust attorney Bruce Johnson, met with the A.G. Edwards account manager informing him that Gifford and Simonson had taken over as successor trustees for the trust because Fritz had become incapacitated. Sometime thereafter, A.G. Edwards' legal counsel again reviewed the trust documents. The account manager testified in a deposition that A.G. Edwards had previously received a copy of Fritz's power of attorney.

[¶ 9] In 1999, Western State Bank began lending money to Gifford for his personal business, Nationwide Communications, doing business as Diversified Communications. In 2000, Gifford experienced difficulties with his loan at Western State Bank. In August 2001, Gifford purchased a $30,000 certificate of deposit from Western State Bank, using trust funds drawn from the trust's checking account at Alerus. The record reflects the certificate of deposit was placed in the name of the trust. Gifford subsequently pledged the trust's certificate of deposit as collateral for his personal business loans with Western State Bank.

[¶ 10] In 2002, Gifford also wrote a number of checks to Western State Bank drawn from the trust's checking account at

Alerus. In doing so, Gifford requested disbursements from the trust's accounts at A.G. Edwards and purportedly deposited funds into the trust's checking account at Alerus. Gifford then wrote checks payable to Western State Bank from the trust's Alerus account. A Western State Bank employee, who was hired as a business banking officer in March 2002 and promoted to vice president/business banking manager in February 2003, testified in his deposition that the trust's funds were deposited in accounts belonging to Gifford or to one of his businesses. In July 2002, that business banking officer for Western State Bank met with Gifford to discuss Gifford's company's financial condition. By August 2002, Gifford had written approximately $92,000 in checks to Western State Bank from the trust's Alerus account.

[¶ 11] In August 2002, Bruce Johnson, the attorney for the trust, asked Gifford and Simonson for an updated status of the trust's assets. In September 2002, Western State Bank "reset" its loans to Gifford, and Gifford signed a trust certificate certifying he was an authorized signer for the trust as a trustee. Johnson wrote a second letter to Gifford asking for trust records and subsequently met with Gifford. Gifford admitted to Johnson that he "loaned" himself over $100,000 from the trust. Johnson wrote a letter to Simonson, notifying Simonson of Gifford's misuse of trust assets and asking Simonson to take over all financial responsibility for the trust.

[¶ 12] In early May 2003, a Western State Bank business banking officer spoke with a forensic accountant, who was at that time conducting an investigation ordered by Johnson and Simonson, regarding Gifford's activities. In late May 2003, Western State Bank applied the trust's certificate of deposit, which Gifford had pledged as security for his personal business loans, to Gifford's outstanding personal business loan balance. In July 2004, Western State Bank sued Gifford and his businesses, seeking in excess of $125,000 for his business loans. Gifford was ultimately removed as a trustee, and Alerus was appointed as a corporate joint trustee in place of Gifford. Gifford's debts were apparently later discharged through bankruptcy.

[¶ 13] In 2005, Alerus Financial and Simonson, as the current Trustees, sued Western State Bank and A.G. Edwards seeking to recover the trust assets taken by Gifford. In its action against A.G. Edwards, the Trustees asserted claims for breach of contract, negligence, and breach of fiduciary duty. In its action against Western State Bank, the Trustees asserted claims for negligence, breach of fiduciary duty, conversion, and permitting unauthorized withdrawals or wrongful release of funds under North Dakota's version of the Uniform Commercial Code (U.C.C.).

[¶ 14] Western State Bank moved for summary judgment, which A.G. Edwards supported, and the Trustees made a cross-motion for partial summary judgment. The district court denied summary judgment to the Trustees and granted summary judgment for Western State Bank and A.G. Edwards.

[¶ 15] The Trustees have appealed from the district court's "order" granting summary judgment. Generally, "an order granting summary judgment is not appealable." *Wheeler v. Gardner*, 2006 ND 24, ¶ 6, 708 N.W.2d 908. However, in this case, a judgment dismissing the Trustees' claim with prejudice was subsequently entered. Since there is a subsequent consistent judgment, we treat the Trustees' appeal as an appeal from that judgment. *See Lawrence v. Delkamp*, 2006 ND 257, ¶ 6, 725 N.W.2d 211; *Sand-*

*erson v. Walsh County,* 2006 ND 83, ¶ 4, 712 N.W.2d 842.

## II.

[¶ 16] Summary judgment under N.D.R.Civ.P. 56(c) is a procedural device for the prompt and expeditious disposition of any action without a trial "if either litigant is entitled to judgment as a matter of law and if no dispute exists as to either the material facts or the inferences to be drawn from undisputed facts, or if resolving factual disputes will not alter the result." *Duemeland v. Norback,* 2003 ND 1, ¶ 8, 655 N.W.2d 76 (citing *Wahl v. Country Mut. Ins. Co.,* 2002 ND 42, ¶ 6, 640 N.W.2d 689). Whether the district court properly granted a summary judgment motion "is a question of law that we review de novo on the record." *Trinity Hosps. v. Mattson,* 2006 ND 231, ¶ 10, 723 N.W.2d 684.

[¶ 17] "The party moving for summary judgment must show . . . no genuine issues of material fact [exist] and the case is appropriate for judgment as a matter of law." *Id.* "In determining whether summary judgment was appropriately granted, we . . . view the evidence in the light most favorable to the party opposing the motion," giving that party "the benefit of all favorable inferences which can reasonably be drawn from the record." *Hasper v. Center Mut. Ins. Co.,* 2006 ND 220, ¶ 5, 723 N.W.2d 409. However, "[u]nder N.D.R.Civ.P. 56, if the movant meets its initial burden of showing the absence of a genuine issue of material fact, the party opposing the motion may not rest on mere allegations or denials in the pleadings, but must present competent admissible evidence by affidavit or other comparable means to show the existence of a genuine issue of material fact." *Riemers v. Grand Forks Herald,* 2004 ND 192, ¶ 4, 688 N.W.2d 167.

## III.

[¶ 18] Resolution of the issues raised in this appeal involves the interpretation of the durable power of attorney and the trust agreement. Our goal in construing these documents is to ascertain Fritz's intent, in conjunction with the scope of Gifford's authority at the time of the relevant transactions.

[¶ 19] A power of attorney is a written instrument in which one authorizes another to act as one's agent. *Matter of Estate of Mehus,* 278 N.W.2d 625, 629 (N.D.1979). The agent holding the power of attorney is the attorney-in-fact. *Id.* "Any person having capacity to contract may appoint an agent and any person may be an agent." N.D.C.C. § 3–01–04. In describing rules for interpreting a power of attorney, we have explained:

> "Because a power of attorney creates an agency relationship, *agency principles are applicable in determining the authority and duties of the attorney in fact.* [*Matter of Estate of Mehus,* 278 N.W.2d 625, 629 (N.D.1979) ] An agency relationship involves both a contractual and a fiduciary relationship, and the interpretation of an agent's authority is governed by the rules for construing contracts, *except to the extent the fiduciary relationship requires a different rule.* Burlington N. and Sante Fe Ry. Co. v. Burlington Res. Oil and Gas Co.,* 1999 ND 39, ¶ 15, 590 N.W.2d 433."

*Estate of Littlejohn,* 2005 ND 113, ¶ 7, 698 N.W.2d 923 (emphasis added). "[This Court] construe[s] contractual agreements to give effect to the parties' intent, which if possible must be ascertained from the writing as a whole." *Id.; Burlington Northern,* at ¶ 22. A contract's clear and explicit language governs its interpretation, and its "words are construed in their ordinary sense." *Burlington Northern,* at

¶ 22. When the parties' intent "can be ascertained from the agreement alone, interpretation of the contract is a question of law." *Meide v. Stenehjem*, 2002 ND 128, ¶ 7, 649 N.W.2d 532.

[¶ 20] An agency created under a durable power of attorney entails a confidential relationship and fiduciary duties. *Allard v. Johnson*, 2006 ND 243, ¶ 6, 724 N.W.2d 331; *Roberts v. North Dakota Dep't of Human Servs.*, 2005 ND 50, ¶ 12, 692 N.W.2d 922. "An agent cannot do any act that a trustee is forbidden to do by any of the provisions of sections 59–01–09 to 59–01–19." *Allard*, at ¶ 6 (citing N.D.C.C. § 3–02–05). As this Court explained in *Allard*, at ¶ 6, "[c]hapter 59–01, N.D.C.C., requires a trustee 'to act in the highest good faith toward the beneficiary.' N.D.C.C. § 59–01–09; *see also* N.D.C.C. § 59–01–10 ('Trustee shall not profit by use of property'); N.D.C.C. § 59–01–12 ('Use of influence for own advantage prohibited'); N.D.C.C. § 59–01–15 ('Violation is a fraud against beneficiary')." Furthermore, all transactions between a trustee and a beneficiary are presumed to be entered into without sufficient consideration and under undue influence where the trustee obtains any advantage from the beneficiary. N.D.C.C. § 59–01–16. Thus, "[t]he interpretation of an agent's authority is governed by rules for construing contracts, except to the extent the fiduciary relationship requires a special rule." *Hendricks Prop. Mgmt. Corp. v. Birchwood Props. Ltd. P'ship*, 2007 ND 181, ¶ 10, 741 N.W.2d 461.

[¶ 21] The trust agreement states North Dakota law governs the validity and construction of the agreement. "Where construing a trust instrument, [this Court's] primary objective is to ascertain the settlor's intent." *Matter of Estate of Schmidt*, 1997 ND 244, ¶ 13, 572 N.W.2d 430 (quoting *Hecker v. Stark County Soc. Serv. Bd.*, 527 N.W.2d 226, 229 (N.D. 1994)). "When a trust instrument is unambiguous, the settlor's intent is ascertained from the language of the trust document itself." *Hecker*, at 230. "Whether or not a trust is ambiguous is a question of law, fully reviewable on appeal." *Id.* This case is about when a third-party may be held liable for dealing with a trustee, who is also the grantor's attorney-in-fact and who allegedly commits breaches of trust and fiduciary duties. Until recently, N.D.C.C. § 59–01–20, outlined the scope of liability for third persons dealing with a trustee and, as relevant to the transactions in this case, stated:

> "One who actually *and in good faith* transfers any money or other property to a trustee as such is not bound to see to the application thereof, and the person's rights in no way can be prejudiced by a misapplication thereof by the trustee. *Other persons at their peril must see to the proper application of money or other property paid or delivered by them.*"

*Id.*[1] (emphasis added).

## IV.

[¶ 22] The Trustees argue the district court erred in granting A.G. Ed-

---

1. This section has since been repealed and replaced by provisions of the Uniform Trust Code ("U.T.C."). *See* 2007 N.D. Sess. Laws ch. 549, § 27; *see also* N.D.C.C. § 59–18–12 (Supp.2007) (containing U.T.C. § 1012 and dealing with the protection of person dealing with a trustee). Although the U.T.C. provides for some application to existing trust relationships, the parties have not suggested the new trust code applies to this case, nor do we determine these new provisions apply to these judicial proceedings. *See, e.g., Makedonsky v. North Dakota Dep't of Human Servs.*, 2008 ND 49, ¶ 12, 746 N.W.2d 185; *see* N.D.C.C. § 59–19–02(2) (Supp.2007) (containing U.T.C.

wards summary judgment. They assert the court erred in concluding Gifford was acting under the power of attorney when he requested trust fund disbursements from A.G. Edwards. The Trustees further assert that even if Gifford was acting as an attorney-in-fact, A.G. Edwards was not authorized to disburse funds to Gifford because the action was taken without both Gifford and Simonson's signatures as trustees. A.G. Edwards responds that the district court properly interpreted the power of attorney and construed the trust agreement to give effect to Fritz's intentions. A.G. Edwards also asserts the trust's third-party exculpatory clauses preclude its liability to the Trust.

[¶ 23] In granting A.G. Edwards summary judgment, the district court agreed with its assertions that, based upon the language of the power of attorney and the trust, Gifford was authorized to conduct the various transactions unilaterally as Fritz's attorney-in-fact. The district court thus concluded there was no breach of contract by A.G. Edwards because Gifford had the power as Fritz's attorney-in-fact to withdraw trust assets from the A.G. Edwards account.

### A.

[¶ 24] Fritz's power of attorney was a durable power of attorney under N.D.C.C. § 30.1–30–01 because the document's specific language provided that the powers granted to Simonson and Gifford were not affected by Fritz "becoming disabled, incompetent or incapacitated or the lapse of time." The power of attorney states it was Fritz's intent that the authority conferred would be exercisable notwithstanding "physical disability or mental incompetence." The power of attorney gave both Simonson and Gifford broad discretionary powers to act separately, in addi-

tion to authorizing either to "create, amend or terminate" trusts and "to remove property" from trusts.

[¶ 25] Furthermore, in the trust agreement, Fritz specifically reserved the right to revoke or amend the trust or remove assets, stating (emphasis added):

*"The Grantor reserves the right, at any time, and without the consent of any person or notice to any person other than the Trustee, to amend or revoke in whole or in part this Agreement or any trust created hereunder,* including the right to change the terms or beneficiaries thereof, by delivering to the Trustee written notice of such amendment or revocation signed by the Grantor.... *The sale or other disposition by the Grantor of the whole or any part of the trust estate held hereunder shall constitute as to such whole or part a revocation of this Agreement and the trust or trusts affected thereby.*

"The Grantor reserves the power and the right during the life of the Grantor to collect any rent, interest or other income which may accrue from the trust estate and, in his sole discretion to accumulate such income as a trust asset or to pay such income to the Grantor individually and not in any fiduciary capacity. The Grantor further reserves the power and right during [the] life of the Grantor to mortgage or pledge all or any part of the trust estate as collateral for any loan."

[¶ 26] We agree in part with the district court regarding the trust's assets at A.G. Edwards. Based upon the plain language of the power of attorney and the trust agreement, Fritz intended for Simonson and Gifford to each separately have "actual authority" to withdraw trust assets, as Fritz had reserved this power for

§ 1106 and providing rules for application to    existing relationships).

himself as the grantor. *See, e.g., Bank IV, Olathe v. Capitol Fed. Sav. & Loan Ass'n,* 250 Kan. 541, 828 P.2d 355, 364–65 (1992) (holding durable power of attorney conferred broad powers sufficient to authorize savings and loan association to issue checks for depositor's funds to an attorney-in-fact personally at the attorney-in-fact's request). The district court therefore did not err in concluding Gifford could separately withdraw trust assets at A.G. Edwards as Fritz's attorney-in-fact.

[¶ 27] The Trustees nevertheless argue that no evidence demonstrates Gifford was acting under Fritz's power of attorney at the time of his dealings with A.G. Edwards. Courts have held, however, that where a party can demonstrate an agent's "actual authority," it is not necessary for that party to have known of it or relied on it when dealing with the agent. *See Wood v. Crocker First Nat'l Bank,* 107 Cal.App. 685, 291 P. 221, 222–23 (1930) (holding evidence also established bank's reliance on existing power of attorney); *see also Milliken Group, Inc. v. Hays Nissan, Inc.,* 86 S.W.3d 564, 567 (Tenn.Ct.App.2001) ("If an agent acts with actual authority, then he may bind the principal in contract regardless of whether the third party is actually aware of that authority at the time of the transaction."); *St. Gaudens v. Southeast Bank, N.A.,* 559 So.2d 1259, 1260–61 (Fla.Dist.Ct.App.1990) (agreeing it is irrelevant whether third-party relied on or knew about existence of the power of attorney because third-party reliance is a relevant consideration only in cases of apparent authority, not actual authority); *Myers v. Stephens,* 233 Cal.App.2d 104, 43 Cal.Rptr. 420, 429 (1965) ("Where the agent acts within the scope of his actual authority, it is immaterial whether or not an inquiry into the extent of the authority has been made by a person dealing with the agent."). Here, the power of attorney granted Gifford actual authority to withdraw assets from the trust's A.G. Edwards account.

### B.

[¶ 28] The Trustees further argue Gifford could not have been acting as Fritz's attorney-in-fact to revoke or partially revoke the trust because no notice was delivered to the trustee under language of the trust requiring the Grantor to deliver "to the Trustee written notice of such amendment or revocation signed by the Grantor."

[¶ 29] "[A] settlor who has reserved the power to revoke upon written notice to the trustee ordinarily cannot revoke the trust without providing the trustee with written notice." 5 Austin W. Scott, William F. Fratcher, Mark L. Ascher, *Scott and Ascher on Trusts* § 35.1.2, at 2286 (5th ed.2008). "[C]ourts[, however,] have often been willing, in appropriate circumstances, to find compliance with the terms of the trust, though there has plainly not been literal compliance." *Id.* at 2287 (referring also to Unif. Trust Code § 602(c)(1) ("The settlor may revoke ... a revocable trust ... by substantial compliance with a method provided in the terms of the trust ....."); *compare* N.D.C.C. § 59–14–02(3) (Supp.2007) (containing U.T.C. § 602)). *See also Paul v. Arvidson,* 123 P.3d 808, 811 (Okla.Civ.App.2005) (dismissing requirement that sole remaining grantor/trustee deliver notice to self as absurd and holding grantor revoked trust by deeding property to later trust); *Argo v. Moncus,* 721 So.2d 218, 221–22 (Ala.Civ.App.1998) (holding grantor/trustee was not required to give self written notice since writing was for benefit of trustee and could be waived).

[¶ 30] Here, if "substantial compliance" with the notice provision is sufficient, the record indicates Simonson received confirmation slips of Gifford's

actions and was sent statements from A.G. Edwards. Furthermore, requiring Gifford as attorney-in-fact to give himself notice as trustee would be an idle act. The law does not require idle acts. N.D.C.C. § 31–11–05(23).

## C.

[¶ 31] Even assuming Gifford could not have partially revoked the trust because he failed to give the requisite notice under the trust instrument, we agree with A.G. Edwards that the undisputed facts establish Simonson and Gifford acted jointly to permit Gifford to withdraw assets from the trust's account at A.G. Edwards.

[¶ 32] The undisputed facts establish that A.G. Edwards had a long-term relationship with both Fritz and the trust going back to the trust's inception in 1992 and that at the relevant times A.G. Edwards had copies of the trust documents and the power of attorney. The record reflects that at a late 1999 or early 2000 meeting with the A.G. Edwards account manager, Simonson and Gifford authorized A.G. Edwards to act on Gifford's instructions regarding the day-to-day activities of the trust's assets. Simonson, on the other hand, maintained a supervisory role over the trust's assets, which included reviewing statements received from the financial institutions with which the trust dealt. The record shows Simonson, who lived in Wisconsin, made trips to Fargo four to five times a year to meet with Fritz, Gifford, and attorney Johnson. Simonson testified in his deposition that, during the relevant time period, he was aware of trading activities at A.G. Edwards, had received confirmation slips, and had not asked A.G. Edwards to stop dealing with Gifford or to require his further authorization of the transactions. We also agree with A.G. Edwards's argument that Trustees have failed to establish joint signatures were required to remove trust funds from the A.G. Edwards account and that the trust agreement does not specifically require joint signatures to do so. The trust agreement requires the successor trustees to act jointly and permits a remaining successor trustee to act alone if the other fails or ceases to act as trustee. Furthermore, the trust instrument itself supports the authority of Gifford in defining the powers of the trustee: "(p) To execute and deliver any and all instruments or writings which it may deem advisable to carry out any of the foregoing powers. No party to any such instruments or writings shall be obligated to inquire into its validity."

[¶ 33] The undisputed facts establish Simonson and Gifford acted jointly permitting Gifford to withdraw assets from the trust account at A.G. Edwards, and the Trustees on appeal have failed to show the existence of a material fact issue. *See also* former N.D.C.C. § 59–02–11 (requiring co-trustees to "unite in any act to bind the trust property, unless the declaration of trust provides otherwise").

[¶ 34] Because we conclude the power of attorney permitted Gifford to act separately to withdraw trust assets held at A.G. Edwards, and because we further conclude the Trustees failed to show the existence of a material fact that Simonson and Gifford did not act jointly to permit the A.G. Edwards transactions, the district court did not err in granting A.G. Edwards summary judgment.

## V.

[¶ 35] The Trustees argue the district court erred in granting Western State Bank summary judgment. They claim the court erred in concluding no banking relationship existed between Western State Bank and the trust. The Trustees further assert the court erred in concluding that

Gifford was acting under a power of attorney when signing and depositing checks at Western State Bank with the caption "Robert F. Fritz, Dale Gifford as trustee" and by pledging trust assets to Western State Bank.

[¶ 36] In granting Western State Bank summary judgment, the district court concluded the Trustees' claims for negligence and breach of a fiduciary duty lacked merit because Western State Bank did not have a "banking relationship" with the trust. In dismissing the Trustees' conversion claim against Western State Bank, the district court concluded Western State Bank was not liable under N.D.C.C. § 41–03–57(1) because "Gifford was entitled to enforce the instrument or receive payment." The court held Gifford had the power to use trust assets to purchase the $30,000 certificate of deposit and pledge it as collateral for his business loan and to issue the checks to Western Sate Bank drawn on the trust checking account. The court reasoned Gifford had this power because he was authorized to separately act as trust grantor under Fritz's power of attorney, which included the power to create, amend or terminate the trust and to remove property from the trust, and because Fritz had specifically retained certain powers as the trust grantor, permitting him to sell or dispose of the whole or any part of the trust estate and to mortgage or pledge all or any part of the trust as collateral for any loan. The district court essentially concluded Gifford had "actual authority" under the power of attorney in its transactions with Western State Bank.

### A.

[¶ 37] Unlike claims against A.G. Edwards, the Trustees assert in Count VI that Western State Bank is liable for conversion under North Dakota's version of the U.C.C. because Western deposited the checks Gifford wrote from the trust's Alerus account, even though Simonson's signature was missing. The Trustees assert in Count VII that Western State Bank wrongfully released the Trust's funds in violation of U.C.C. requirements that Gifford's signature be "authorized." Both of these claims against Western require analysis under the U.C.C. that was not present in our consideration of the claims against A.G. Edwards.

[¶ 38] Section 41–03–40, N.D.C.C. is part of our U.C.C. and states:

"1. Unless otherwise provided in this chapter or chapter 41–04, an *unauthorized signature* is ineffective except as the signature of the unauthorized signer in favor of a person who in good faith pays the instrument or takes it for value. An unauthorized signature may be ratified for all purposes of this chapter.

2. If the signature of more than one person is required to constitute the authorized signature of an organization, *the signature of the organization is unauthorized if one of the required signatures is missing.*

3. The civil or criminal liability of a person who makes an unauthorized signature is not affected by any provision of this chapter that makes the unauthorized signature effective for the purposes of this chapter."

(Emphasis added.) At the time of Gifford's transactions with Western State Bank, N.D.C.C. § 41–01–11(43) [*see now* N.D.C.C. § 41–01–09(2)(oo) ], defined an unauthorized signature, and provided: " 'Unauthorized' signature means one made without actual, implied or apparent authority and includes a forgery."

[¶ 39] Here, Gifford's transactions with Western State Bank are different from the disbursements from the trust's account at

A.G. Edwards because of Gifford's apparent self-dealing in the Western State Bank transactions. Unlike the requests for the trust fund disbursements from A.G. Edwards, Gifford's transactions with Western State Bank, and in particular Gifford's pledge of the trust's certificate of deposit held by Western State Bank, raise an inference of self-dealing under agency law.

[¶ 40] As we explained, because a power of attorney creates an agency relationship, agency principles are applicable in determining the authority and duties of the attorney-in-fact. *Estate of Littlejohn*, 2005 ND 113, ¶ 7, 698 N.W.2d 923.

"Agency is the relationship which results where one person, called the principal, authorizes another person, called the agent, to act for him in dealing with third persons. Section 3–01–01, N.D.C.C. An agency relationship is either actual or ostensible. It is actual when the agent really is employed by the principal. It is ostensible when the principal intentionally or by want of ordinary care causes a third person to believe another to be his agent, who, in actuality, is not employed by the principal. § 3–01–03, N.D.C.C. Agency is created and authority is conferred by a prior authorization or a subsequent ratification of the act. § 3–01–06, N.D.C.C. Actual authority is authority which the principal intentionally confers upon the agent or by want of ordinary care allows the agent to believe himself to possess. 'Ostensible' or 'apparent' authority is authority which the principal intentionally or by want of ordinary care allows a third person to believe the agent possesses. § 3–02–02, N.D.C.C. *An agent never has actual or ostensible authority to do an act which is, and is known or suspected by the person with whom he deals to be, a fraud upon the principal.*

§ *3–02–07, N.D.C.C.* When an agent exceeds his authority, his principal is bound by his authorized acts so far only as they can be plainly separated from those which are unauthorized. § 3–03–02, N.D.C.C. A principal is bound by acts of his agent under a merely ostensible authority to those persons only who in good faith and without ordinary negligence have incurred a liability or parted with value upon the faith thereof. § 3–03–03, N.D.C.C.

"In *Lander v. Hartson*, 77 N.D. 923, 47 N.W.2d 211 (1951), we held that a presumption exists that a person acts for himself and not as the agent of another. Where the existence of an agency relationship is denied the burden of proof is upon the party who affirms its existence. The burden of proof, i.e., the burden of persuasion, in such cases is clear and specific—clear and convincing. In *Hagel v. Buckingham Wood Products, Inc.*, 261 N.W.2d 869 (N.D.1977), we stated that a third person acts in good faith and without ordinary negligence if the third person uses reasonable diligence and prudence in ascertaining whether the agent acts within the scope of his authority. The mere assumption of authority will not bind the principal."

*Farmers Union Oil Co. v. Wood*, 301 N.W.2d 129, 133–34 (N.D.1980) (emphasis added). Agency is generally a question of fact. *Red River Commodities, Inc. v. Eidsness*, 459 N.W.2d 805, 810 (N.D.1990).

[¶ 41] In *Burlington Northern*, 1999 ND 39, ¶ 3, 590 N.W.2d 433, this Court addressed an agent's alleged self-dealing with its principal's oil and gas rights, including the scope of the principal's authorization for such dealings. In *Hendricks Property Mgmt. Corp.*, we discussed the impact of *Burlington Northern*:

426

"We said the terms of the parties' management agreement generally governed the agent's duties to the principal, but an agency agreement is also a special kind of contract that must be interpreted in light of the fiduciary relationship between the agent and the principal. *Id.* at ¶¶ 15–16. We recognized, however, that an agent's duties to the principal were governed by the rules of contract interpretation, and by contract, the parties may 'otherwise agree' to alter the normal rules of their relationship. *Id.* at ¶ 15. In *Burlington Northern,* we construed the parties' agreement to be a general authorization for self-dealing, which did not specifically eliminate the agent's fiduciary duties to the principal. *Id.* at ¶¶ 22–26.

"*Burlington Northern* involved the interpretation of an agent's authority under a management agreement that, in the absence of language specifically eliminating the agent's fiduciary duties, this Court construed to impose certain fiduciary duties on the agent."

*Hendricks Property Mgmt. Corp.,* 2007 ND 181, ¶¶ 11–12, 741 N.W.2d 461.

[¶ 42] In this case, the district court assumed for purposes of its analysis that both Gifford and Simonson's signatures were required for a valid action by Gifford and Simonson in their roles as trustees. The current Trustees asserted in the district court that Western State Bank is liable for conversion because Western State Bank deposited the checks Gifford wrote on the trust's Alerus account without Simonson's signature. The district court here essentially concluded that Gifford was actually authorized to act separately in his transactions with Western State Bank under Fritz's power of attorney. We have said that an agent never has actual or ostensible authority to do an act which is, and is known or suspected by

the person with whom he deals to be, a fraud upon the principal. *See* discussion *supra* ¶ 40. We have also said an agent cannot do any act a trustee is forbidden to do under former N.D.C.C. §§ 59–01–09 to 59–01–19. *See* discussion *supra* ¶ 20.

[¶ 43] Furthermore, the power of attorney does not authorize Gifford to engage in self-dealing. Because Gifford remained a trustee with respect to the trust property, Gifford could not exceed the authority regarding self-dealing granted by the trust. Specifically, the trust instrument states, "Notwithstanding anything to the contrary contained herein, during such time as any beneficiary of any trust created hereunder (other than the Grantor) may be acting as a Trustee hereunder, such person *shall be disqualified from exercising any power to make any discretionary distributions of income or principal to himself, or to satisfy any of his legal obligations, or to make discretionary allocations in his own favor* of receipts or disbursements as between income and principal." (Emphasis added.) Notably, Gifford was listed as a beneficiary under the trust.

[¶ 44] Here, the Trustees cited evidence that Gifford had a previous business relationship with Western State Bank, that Gifford had problems with his business debt, and that Gifford used funds drawn from the trust's checking account at Alerus to purchase the certificate of deposit in the trust's name at Western State Bank. Gifford subsequently pledged the trust's certificate of deposit as collateral for his personal business debt at Western State Bank. There is also evidence of ten checks written in 2002 by Gifford as trustee on the trust's Alerus account naming "Western State Bank," "Western Bank," or "State Bank" as the payee. Each check had on its face the caption "Robert F. Fritz, Dale Gifford, as trustee." Deposi-

tion testimony from the Western State Bank business banking officer indicates some or all of the money from the checks was deposited into accounts of Gifford or his businesses. Although Western State Bank claims on appeal it relied upon the power of attorney in its transactions, there is evidence it did not even possess the power of attorney or trust documents at the time of the transactions at issue in this case. *Cf. Houck v. Feller Living Trust,* 191 Or.App. 39, 79 P.3d 1140, 1142–43 (2003) (stating "critical issue" was whether plaintiff/third party creditor "had actual notice or was otherwise aware of facts that would oblige her to inquire as to whether using trust assets for [attorney-in-fact's] personal benefit exceeded the scope of his authority to act as an agent of the trust"; and holding where it was undisputed that plaintiff was aware attorney-in-fact "used the loans for his own personal purposes," "[t]hat self-dealing alone . . . put plaintiff on inquiry notice regarding whether [attorney-in-fact] was acting within the scope of his authority").

[¶ 45] We conclude the power of attorney and trust agreement construed together do not authorize Gifford to engage in self-dealing and the district court erred in concluding the power of attorney provided actual authority for Gifford's transactions with Western State Bank. Viewing the evidence in the light most favorable to the Trustees and giving them the benefit of all favorable inferences, the Trustees have raised an issue of material fact whether Gifford was authorized, either under ostensible authority or acting jointly under the trust, in his transactions with Western State Bank. We therefore conclude the Trustees' U.C.C. claims in Counts VI and VII against Western State Bank should not have been dismissed.

**B.**

[¶ 46] The Trustees' claims against Western State Bank for "breach of fiduciary duty" and "negligence" in Counts IV and V also turn on an analysis under portions of the U.C.C. applicable to banks handling negotiable instruments. The Trustees referred during oral argument to *Mott Grain Co. v. First Nat'l Bank & Trust Co.,* 259 N.W.2d 667 (N.D.1977), where this Court applied an earlier version of U.C.C. § 3–304 (former N.D.C.C. § 41–03–34). In *Mott Grain,* a grain company brought an action against a bank to recover the value of third-party checks payable to the grain company, which the company's manager had deposited in his personal account for his own benefit. *Id.* at 670–71. This Court concluded, "The bank had notice of the grain company claims by virtue of [N.D.C.C.] section 41–03–34 (U.C.C. § 3–304) and failed to investigate [the manager's] authority to deal with the checks as his own." *Mott Grain,* at 671. This Court further concluded, "[T]he bank did not acquire the instruments 'without notice' and, therefore [could not] claim the benefits of the status of holder in due course." *Id.* at 670. Thus, as merely a holder rather than a holder in due course, the bank was subject to the claims and defenses of the grain company. *Id.*

[¶ 47] Here, the district court noted, "that just because Gifford was authorized does not mean he did not breach his fiduciary duties to both Fritz and the Trust." In concluding there was no banking relationship between the trust and Western State Bank, the district court failed to consider Western State Bank's obligations under the U.C.C. During argument to the district court, the Trustees' attorney asserted:

"As to Western State Bank, essentially we pled four causes of action. We've pled common law conversion, breach of

fiduciary duty, and negligence, the three that we aren't moving on today, and then we've pled conversion and wrongfully dealing with a negotiable instrument under the UCC. There are a couple of provisions of the UCC, I think, that are applicable here. And I've cited them both here, 41–03–32 [U.C.C. rev. § 3–306] and 41–03–57 [U.C.C. rev. § 3–420]. And they both talk about a person who wrongfully is in possession of a negotiable instrument or its proceeds, needs to give them back."

This distinction between Gifford's authority and Gifford's apparent breach of fiduciary duties is crucial because, based upon North Dakota's enactment of the U.C.C., there are material fact issues as to whether Western State Bank was on notice of a breach of fiduciary duty at the time of taking the checks from Gifford and when taking a security interest in the trust's certificate of deposit.

[¶ 48] Section 41–03–33, N.D.C.C. (U.C.C. § 3–307), describes when the taker of an instrument is on notice of a breach of fiduciary duty and states, in relevant part:

"In this section:

1. 'Fiduciary' means an agent, trustee partner, corporate officer or director, or other representative owing a fiduciary duty with respect to an instrument.

. . . .

4. If the instrument is issued by the represented person or the fiduciary, as such, *to the taker as payee,* the taker has notice of the breach of fiduciary duty *if the instrument is taken in payment of or as security for a debt known by the taker to be the personal debt of the fiduciary, taken in a transaction known by the taker to be for the personal benefit of the fiduciary, or deposited to an account other than an account of the fiduciary, as such, or an account of the represented person."*

(Emphasis added.)

[¶ 49] This section was adopted by the Legislature in 1991 and is part of revisions to U.C.C. article 3, which substantially changed rules applicable to depositary banks that take checks from fiduciaries. *See C–Wood Lumber Co. v. Wayne County Bank,* 233 S.W.3d 263, 276 (Tenn.Ct.App. 2007). Section 3–307, U.C.C. (N.D.C.C. § 41–03–33), is essentially "an elaborate statement of the 'red flag' circumstances under which the taker from a fiduciary will be deemed" to be on notice of a fiduciary's breach of fiduciary duty. *C–Wood,* at 276; *see also* Marion W. Benfield, Jr. and Peter A. Alces, *Bank Liability for Fiduciary Fraud,* 42 Ala. L.Rev. 475, 517–18 (1991). Former U.C.C. § 3–304 also dealt with notice to persons dealing with fiduciaries, but only superficially. *See* Benfield, *supra* at 518.

[¶ 50] After adoption of revised article 3, a depositary bank or "taker" is on notice of a breach of fiduciary duty if the bank takes a check issued by the fiduciary to the "taker as payee," and the check is taken "in payment of or as security for a debt *known by the taker* to be the personal debt of the fiduciary, taken in a transaction *known by the taker* to be for the personal benefit of the fiduciary, or deposited to an account other than an account of the fiduciary, as such, or an account of the represented person." N.D.C.C. § 41–03–33(4) (emphasis added). If Western State Bank had notice of Gifford's breach of fiduciary duty, Western State Bank's actions in dealing with him may not have been in "good faith" since Gifford could not be "authorized" to breach his fiduciary duties under either the power of attorney or the trust agreement. *See* N.D.C.C. § 41–01–02(3) (1999) (stating "obligations of good faith, diligence, reasonableness,

and care" may not be disclaimed by agreement); N.D.C.C. § 41–01–11(19) (1999) (" 'Good faith' means honesty in fact in the conduct or transaction concerned."); N.D.C.C. § 41–01–13 (1999) (providing every contract or duty under the U.C.C. "imposes an obligation of good faith in its performance or enforcement").

[¶ 51] Based on the discussions just concluded, material fact issues exist regarding whether Gifford was authorized in his Western State Bank transactions and whether Western had notice or knowledge of the nature of Gifford's transactions. However, we do not specifically address any defenses Western State Bank may have under the U.C.C.; nor do we address whether the Trustees' claims or Western State Bank's defenses that may exist in addition to those arising under the U.C.C. because the district court has not yet addressed these issues and may do so on remand.

## VI.

[¶ 52] The Trustees also urge this Court to adopt a cause of action for participation in the breach of a trust, as enumerated in the Restatement (Second) of Trusts § 324 (1959):

"If the trustee deposits trust funds in a bank, the bank is liable for participation in the breach of trust in receiving or in permitting the trustee to withdraw the trust funds, where the trustee commits a breach of trust in making the deposit or withdrawal, if, but only if, the bank received the deposit or permitted the withdrawal with notice of the breach of trust."

[¶ 53] Western State Bank claims this issue was raised for the first time on appeal and should not be considered by this Court. However, the district court recognized the Trustees had argued that the defendants were liable for participation in breach of trust, but the court refused to implement the cause of action because North Dakota had not yet adopted it.

[¶ 54] As previously discussed, former N.D.C.C. § 59–01–20 addressed liability of third persons dealing with a trustee. We also observe that the Legislature's recent enactment of the Uniform Trust Code includes N.D.C.C. § 59–18–12 (Supp.2007), providing protection to third-parties dealing with trustees, and specifically defers to "[c]omparable protective provisions of other laws relating to commercial transactions or transfer of securities by fiduciaries." Notably, both of these provisions include the concept of a third-party acting in "good faith" to avoid liability. These provisions address a third-party's liability in dealing with a trustee. We therefore decline the Trustees' invitation to adopt the Restatement (Second) of Trusts § 324.

## VII.

[¶ 55] We affirm summary judgment in favor of A.G. Edwards, reverse summary judgment for Western State Bank, and remand for further proceedings regarding the claims against Western State Bank.

[¶ 56] GERALD W. VANDE WALLE, C.J., MARY MUEHLEN MARING, CAROL RONNING KAPSNER, DALE V. SANDSTROM, concur.