**CITY OF JAMESTOWN, Plaintiff and Appellee,**

v.

**Kathryn A. BENEDA, Defendant and Appellant.**

**CITY OF JAMESTOWN, Plaintiff and Appellee,**

v.

**Dorothea I. CASE, Defendant and Appellant.**

**CITY OF JAMESTOWN, Plaintiff and Appellee,**

v.

**Alex P. FRELICH, Defendant and Appellant.**

**CITY OF JAMESTOWN, Plaintiff and Appellee,**

v.

**Rose Marie FREUND, Defendant and Appellant.**

**CITY OF JAMESTOWN, Plaintiff and Appellee,**

v.

**Sister Rose M. FREUND, Defendant and Appellant.**

**CITY OF JAMESTOWN, Plaintiff and Appellee,**

v.

**Elizabeth J. GOESER, Defendant and Appellant (Two Cases).**

**CITY OF JAMESTOWN, Plaintiff and Appellee,**

v.

**Owen N. GOESER, Defendant and Appellant (Two Cases).**

**CITY OF JAMESTOWN, Plaintiff and Appellee,**

v.

**M.A. GOLDADE, Defendant and Appellant.**

**CITY OF JAMESTOWN, Plaintiff and Appellee,**

v.

**Julia A. HASS, Defendant and Appellant.**

CITY OF JAMESTOWN, Plaintiff
and Appellee,

v.

Nancy G. BYRD, Defendant
and Appellant.

CITY OF JAMESTOWN, Plaintiff
and Appellee,

v.

Marjorie A. MILLER, Defendant
and Appellant.

CITY OF JAMESTOWN, Plaintiff
and Appellee,

v.

Alice H. MYRUM, Defendant
and Appellant.

CITY OF JAMESTOWN, Plaintiff
and Appellee,

v.

Janice J. NOWATZKI, Defendant
and Appellant.

CITY OF JAMESTOWN, Plaintiff
and Appellee,

v.

John F. NOWATZKI, Defendant
and Appellant (Two Cases).

CITY OF JAMESTOWN, Plaintiff
and Appellee,

v.

David J. PENCE, Defendant
and Appellant.

CITY OF JAMESTOWN, Plaintiff
and Appellee,

v.

Frank R. SCHMITT, Defendant
and Appellant (Two Cases).

CITY OF JAMESTOWN, Plaintiff
and Appellee,

v.

Gertrude A. SCHULER, Defendant
and Appellant.

CITY OF JAMESTOWN, Plaintiff
and Appellee,

v.

Elizabeth I. KISER, Defendant
and Appellant.

Crim. Nos. 910171–910192.

Supreme Court of North Dakota.

Nov. 20, 1991.

Joseph F. Larson, II (argued), Asst. City Atty., Jamestown, for plaintiff and appellee.

Paul T. Crary (argued), Walhalla, for defendants and appellants. Appearance by Peter B. Crary.

LEVINE, Justice.

The appellants were convicted of violating a Jamestown trespass ordinance. We hold that the application of the ordinance under the facts of this case violated the appellants' First Amendment rights of free speech and peaceable assembly. For that reason, we reverse the convictions.

The appellants waived jury trials and submitted their cases to the trial court on stipulated facts and briefs. We refer to those facts throughout this opinion.

The City of Jamestown holds title to the Jamestown Mall, as is required by the Municipal Industrial Development Act, Chapter 40–57, N.D.C.C., for MIDA bond financing under that act. The City has assigned its interest in the property to James Refrigeration Company, the developer of the mall, who, in turn, has leased space in the mall to various tenants, one of whom is Dr. Robert Lucy.

On the north wall of the Jamestown Mall, located adjacent to the east and west entrances, is a posted notice which says in part:

"Any unauthorized activity (exclusive of activity expressly permitted by statute) in the Jamestown Mall common areas not directly related to the commercial purpose for which the Jamestown Mall was developed, regardless of whether that activity is conducted by one or more persons and regardless of whether that activity is peaceful or non-peaceful, will be considered unlawful trespassing, and it will be treated as such by the owners and managing agents of the Jamestown Mall.

\* \* \* \* \* \*

"By way of example only, and not intended to be a complete list, the following are activities which constitute trespassing and will not be permitted: Loitering, soliciting, speech making, picketing, distributing handbills or other literature, seeking signatures on petitions, or taking surveys (or anything else which might be classified as *expressive activity* )." [Emphasis in original.]

The appellants entered the Jamestown Mall and conducted abortion protests in the hallway near Dr. Lucy's second floor medical office. The appellants were informed that "they were not authorized to be in front of Dr. Lucy's office" and were asked to leave. They ignored the notice and remained in place.

The appellants were in the mall to protest and not to engage in any form of business or commerce. During the protests, they sang, prayed and maintained silent vigil. At oral argument, counsel for the parties agreed that the protestors were in all respects peaceful and orderly. They did not attempt to inhibit ingress or egress of patients at Dr. Lucy's clinic nor did they threaten injury to any person or property.

The Jamestown police, summoned by Dr. Lucy, arrested the protesters for criminal trespass.[1] The protestors were subsequently convicted and have filed this appeal.

On appeal, the appellants urge reversal of their convictions because they are based on conduct protected by the First Amendment's guarantees of free speech and peaceable assembly. They assert that application of the city trespass ordinance under these circumstances, to enforce the mall's prohibition against expressive activity, directly infringed upon their First Amendment rights and that their convictions must, therefore, be overturned. We agree.

The First Amendment forbids the enactment of laws "abridging the freedom of speech ... or the right of the people peaceably to assemble." Peaceful picketing and leafletting are examples of expressive activities involving speech protected under the First Amendment. *United States v. Grace,* 461 U.S. 171, 103 S.Ct. 1702, 75 L.Ed.2d 736 (1983). A restriction on the right to engage in protest or picketing on an issue of public concern "operates at the core of the First Amendment" and such restrictions on public-issue picketing are traditionally subjected to careful scrutiny. *Frisby v. Schultz,* 487 U.S. 474, 108 S.Ct. 2495, 101 L.Ed.2d 420 (1988). The scope of protected speech was discussed by the Seventh Circuit Court of Appeals in *United States v. Dellinger,* 472 F.2d 340, 358 (7th Cir.1972), *cert. denied,* 410 U.S. 970, 93 S.Ct. 1443, 35 L.Ed.2d 706 (1973):

"Ideally the analysis should begin with a delineation of the scope of speech protected by the first amendment.... All expression of ideas is effected by, or is, itself, conduct, and all conduct necessarily expresses some idea, emotion, or thought. Perhaps we can do no better than a generalization which equates first amendment 'speech' with conduct which makes an offer in the market place of ideas. Indeed we need no more precise delineation for the purpose of considering the statute here, for it is clear that individual or group conduct for the domi-

---

1. The appellants were convicted of violating Section 22–46 of the Code of the City of Jamestown, North Dakota, which provides:

 "A person is guilty of an offense if, knowing that he is not licensed or privileged to do so, he enters or remains in any place as to which notice against trespass is given by actual communication to the actor by the person in charge of the premises or other authorized person, or by posting in a manner reasonably likely to come to the attention of the intruders."

nant and virtually sole purpose of expressing views on public questions is well within the concept of speech protected by the first amendment."

The City of Jamestown acknowledges that the protestors assembled in a peaceful and orderly manner for the sole purpose of expressing their views on the abortion issue. The City does not argue that the activity of the protesters involved opprobrious or objectionable conduct. Rather, the City only argues that the protestors' activities were lawfully banned by the mall owners, because the mall is privately owned and is not, therefore, subject to First Amendment restrictions.

■ The constitutional guarantee of free speech under the First Amendment is a guarantee only against abridgment by government, federal or state; it provides no protection against infringement by a private corporation or person. *Hudgens v. National Labor Relations Board*, 424 U.S. 507, 96 S.Ct. 1029, 47 L.Ed.2d 196 (1976). To direct our analysis, we briefly trace the history of United States Supreme Court decisions involving the First Amendment in a shopping mall setting.

The United States Supreme Court recognized an exception to the requirement of state action for First Amendment purposes in *Marsh v. Alabama*, 326 U.S. 501, 66 S.Ct. 276, 90 L.Ed. 265 (1946), when it determined that a privately owned corporate town, having all the characteristics of other municipalities, was subject to the people's First Amendment rights of free speech and peaceable assembly. In reaching that conclusion, the court emphasized that the right to exercise the liberties safeguarded by the First Amendment "lies at the foundation of free government by free [people]." *Id.*, at 326 U.S. at 509, 66 S.Ct. at 280, 90 L.Ed. at 270.

Finding striking similarities between the business district of the corporate town in

*Marsh, supra,* and the Logan Valley Mall, a privately owned shopping center, the high court held, in *Amalgamated Food Employees Union Local 590 v. Logan Valley Plaza, Inc.*, 391 U.S. 308, 88 S.Ct. 1601, 20 L.Ed.2d 603 (1968), that peaceful picketers in the mall must be accorded their First Amendment free speech rights and that the mall owners could not bar protected First Amendment expression conducted in the. mall which was consonant with the mall's purpose and use. The majority decision, written by Justice Marshall, recognized that the premises of a shopping center resemble the business areas of a municipality, freely accessible and open to the public, which are historically associated with the exercise of First Amendment rights.

In the subsequent case of *Lloyd Corporation, Ltd. v. Tanner*, 407 U.S. 551, 92 S.Ct. 2219, 33 L.Ed.2d 131 (1972), the court backed away from its position in *Logan Valley Plaza, supra.* *Tanner* also involved a privately owned shopping mall. The mall owners refused to allow persons in the common areas of the mall to distribute materials protesting the draft and the Vietnam War. The high court concluded that a ban on the distribution of literature in the mall did not violate the First Amendment rights of protestors whose attempted expression was unrelated to any specific mall activity and who had alternative means of communicating outside the mall.

In the later case of *Hudgens v. National Labor Relations Board, supra,* the high court fully retreated from its position in *Logan Valley Plaza, supra,* and, expressly overruling that case, held that the constitutional guarantee of free expression under the First Amendment has no part to play where persons are attempting to exercise that right in a privately owned shopping mall.[2]

---

**2.** In the subsequent case of *Pruneyard Shopping Center v. Robins,* 447 U.S. 74, 100 S.Ct. 2035, 64 L.Ed.2d 741 (1980), the high court, while implicitly recognizing that there is no federal constitutional right of free speech in a privately owned shopping mall, held that a state, in the exercise of its police powers, is not precluded from finding such a right under its state constitution. Although the appellants have asserted, in the alternative, a free speech right under our state constitution, we first proceed with their claim of a free speech guarantee under the First Amendment.

Our case is different. In *Tanner, supra,* and *Hudgens, supra,* there were privately owned shopping malls. Here, the City of Jamestown owns the Jamestown Mall and leases it to a private developer. To determine whether the appellants' convictions violated their First Amendment rights we must conduct a two-part analysis. *See Citizens to End Animal Suffering v. Faneuil Hall,* 745 F.Supp. 65 (D.Mass.1990). First, we must determine whether the regulation of the appellants' expressive activity by the Jamestown Mall constitutes state action. Second, if state action is involved, we must then characterize the forum involved to establish the constitutional standard by which we judge the mall's regulation of expressive activity.

■ The appellants assert that the City ownership of this property brings the mall's actions within the realm of state action to which the First Amendment applies. However, the prosecutor argues that there is no state action because the City has mere legal title, and has, in effect, leased away or assigned all control as well as financial risk and benefit to the private developers of the mall. The key question is whether the government, as an owner of property, can, by lease or assignment, disengage the property from the realm of state action and the constitutional imperatives that state action carries with it. We conclude that, under the circumstances of this case, the City has not divested the mall of its "state action" designation for First Amendment purposes. We find several federal cases persuasive on this issue.

*Fernandes v. Limmer,* 663 F.2d 619 (5th Cir.1981), involved the constitutionality of a local ordinance governing distribution of literature and fund solicitation at the Dallas–Ft. Worth Airport complex. The argument in that case was that the leasing of every square foot of the airport to private air carriers removed the facility from the "public forum mold." The Fifth Circuit Court of Appeals disagreed, stating:

"Despite the leaseholds of the air carriers, ownership of the airport remains in the municipal governments. Moreover, the existence of a leasehold by a private party on public property does not remove from the realm of state action restrictions on the exercise of civil rights at the site." *Fernandes, supra,* 663 F.2d at 627.

In *International Society for Krishna Consciousness v. Schrader,* 461 F.Supp. 714 (N.D.Tex.1978), a city owned facility, the Dallas Convention Center, was leased to private tenants for various activities. In rejecting the contention that the private leasing of the facility warranted a declaration "of the nonpublic status of the physical plant," the federal district court said:

"The City seems to seek a declaration of the nonpublic status of the physical plant. Such a blanket exception from the First Amendment is neither constitutionally permissible nor procedurally available. Although *the City* might act in a proprietary role as landowner and let the premises on nondiscriminatory terms, it *cannot furnish as part of its rental package assurance to a tenant that the tenant's activity is insulated from the First Amendment.*

\* \* \* \* \* \*

"Any suggestion that a tenant enjoys unfettered rights to exclude because its activity is wholly private ignores the dual role of the City as sovereign and as landlord in enforcing that censorship; it equally ignores the reality that public forum is not a concept controlled by the common law of real property, running with the land or reverting to and among tenancies. Given the interrelationship of the City, private property owners and the sometime propinquity to public events of the center's usage, the concept here serves as an analytical tool for assaying the relative interest of owners of private property and the interest of a free society in the highly placed value of open markets for ideas. *A tenant of the city need not take his private property, here a leasehold interest into that marketplace, but if he does, he must abide its rules; ...*" *Schrader, supra,* 461 F.Supp. at 717–718 [Emphasis added].

In *Citizens to End Animal Suffering v. Faneuil Hall, supra,* protestors were de-

nied the right to distribute literature in lanes between buildings at Faneuil Hall Marketplace by the private owners who leased the marketplace from the city of Boston. The protestors claimed violations of their First Amendment rights and sought a preliminary injunction against future interference with their attempts to distribute literature. In granting the injunction, the federal district court found that the private owners' actions were fairly attributable to the state. A key factor in the decision was the city's fee simple ownership. Also significant, the city leased the property to revitalize the downtown area and so derived economic benefit from the restrictions imposed by the owners to enhance the success of the marketplace.

Although *Burton v. Wilmington Parking Authority,* 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961) involved racial discrimination rather than infringement of free speech, the decision is instructive for its holding that the conduct of a private restaurant owner, who leased space in a building owned by a state agency and financed by public funds, constituted state action.

These cases persuade us that the Jamestown Mall's restrictions on expressive activity constituted state action in this case. The City's ownership of the property is, in our view, a significant factor in concluding that the attempted infringement of free speech by the mall involved state action. We reject the prosecutor's argument that, because legal title was taken by the City primarily for purposes of meeting statutory prerequisites to MIDA bond financing, the City's ownership should not be equated with the presence of state action.

In *Lawless–Avelar v. Westminster Mall Company,* 819 P.2d 55 (1991), the Supreme Court of Colorado held that free speech rights under its state constitution applied to a private shopping center. In finding the presence of state action in the mall's activities, the court made the following statements with which we agree:

"Our finding that governmental involvement exists here is not based on any single factor. Nevertheless, we find significant the City's two million dollar purchase, financed through the sale of municipal bonds, of improvements which the Company made to adjacent streets and drainage systems. It is now common for governmental entities to compete, by providing financial subsidies or inducements, to attract private business so as to reap the benefits of an increased tax base. Economic necessity, however, cannot provide the cover for government-supported infringements of speech."

The Jamestown City Council issued a resolution approving the MIDA bond financing for the shopping center. In that resolution, the Council expressly recognized "the desirability and need for industrial and business expansion within the community to improve and enhance the economic growth of same." Thus, the project was viewed as a benefit for the City and community as well as for its private participants.

We conclude that the City of Jamestown, as legal owner of the property, could not, by lease or assignment of the property, sweep aside state action and in the process erase the guarantees of free speech accorded to the people under the First Amendment. Therefore, we hold that the restrictions on speech by the mall authorities involved state action by the City of Jamestown, as owner of the property.

Having concluded that the restrictions on expressive activity by the mall constituted state action, we turn to the second part of our analysis to determine the nature of the forum involved and the scope of the appellants' rights of free speech and peaceable assembly under the circumstances.

 The federal constitution does not require the government to freely grant access to all who wish to exercise free speech on every type of government property, without regard to the nature of the property or to the disruption that might be caused by the speaker's activities. *Cornelius v. NAACP Legal Defense and Educational Fund,* 473 U.S. 788, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985). The high court has adopted a forum analysis as a means of balancing the government's interest in limiting the use of its property to its intended

purpose and the interest of those wishing to use the property for expressive activity and other purposes.

This forum analysis was nicely explained by Justice O'Connor in *Board of Airport Commissioners v. Jews for Jesus, Inc.*, 482 U.S. 569, 572–573, 107 S.Ct. 2568, 2571, 96 L.Ed.2d 500, 506 (1987):

"In balancing the government's interest in limiting the use of its property against the interests of those who wish to use the property for expressive activity, the Court has identified three types of fora: the traditional public forum, the public forum created by government designation, and the nonpublic forum. *Perry Ed. Assn. v. Perry Local Educators' Assn.*, 460 U.S. 37, 45–46, 103 S.Ct. 948, 954–955, 74 L.Ed.2d 794 (1983). The proper First Amendment analysis differs depending on whether the area in question falls in one category rather than another. In a traditional public forum or a public forum by government designation, we have held that First Amendment protections are subject to heightened scrutiny:

" 'In these quintessential public forums, the government may not prohibit all communicative activity. For the State to enforce a content-based exclusion it must show that its regulation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end.... The State may also enforce regulations of the time, place, and manner of expression which are content-neutral, are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication.' *Id.*, at 45, 103 S.Ct., at 955.

"We have further held, however, that access to a nonpublic forum may be restricted by government regulation as long as the regulation 'is reasonable and not an effort to suppress expression merely because officials oppose the speaker's view.' *Id.*, at 46, 103 S.Ct., at 955."

*See also, United States v. Kokinda,* —— U.S. ——, 110 S.Ct. 3115, 111 L.Ed.2d 571 (1990).

■ Examples of public fora are public streets and parks which have traditionally been devoted to public assembly and debate. *Perry Education Assn. v. Perry Local Educators' Assn.*, 460 U.S. 37, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983). Public places similar to the common areas of the shopping mall in this case also have been found to be public fora. For example, in *Wolin v. Port of New York Authority*, 392 F.2d 83, 90 (2nd Cir.), *cert. denied*, 393 U.S. 940, 89 S.Ct. 290, 21 L.Ed.2d 275 (1968), the Court of Appeals for the Second Circuit concluded that the municipal bus terminal operated by the Port of New York Authority was a public forum conducive to the public communication of views on issues of political and social significance:

"The Terminal building is an appropriate place for expressing one's views precisely because the primary activity for which it is designed is attended with noisy crowds and vehicles, some unrest and less than perfect order. Like a covered marketplace area, the congestion justifies rules regulating other forms of activity, but it seems undeniable that the place should be available for use in appropriate ways as a public forum. The admission of charity solicitors, glee clubs and automobile exhibitions without untoward incident evidences the ease with which the Terminal accommodates different forms of communication. To deny access to political communication seems an anomalous inversion of our fundamental values."

Not unlike the bus terminal in *Wolin, supra*, the common walkways and public areas of the modern-day mall, like the Jamestown Mall, lend themselves to expressive activity of the public. These malls offer concourses that are wide, well lit and able to accommodate large numbers of the public at one time. They are complete with restrooms, sitting areas and fountains. They often include display areas for entertainers, exhibitors and others to perform for the public at large. In essence, they are the functional equivalent of the city

streets, squares and parks of earlier days. Indeed, in many instances, the shopping mall has displaced the shops along main street. With its controlled environment, it is an appealing place for the public to converse and socialize as well as to browse and shop in and about the stores there.

In many ways, the common walkways of a shopping mall are indistinguishable from the concourse of the St. Louis airport facility found to be a public forum in *Jamison v. City of St. Louis,* 828 F.2d 1280, 1283 (8th Cir.1987), *cert. denied,* 485 U.S. 987, 108 S.Ct. 1289, 99 L.Ed.2d 499 (1988):

> "We agree with these courts and with the City's implicit acknowledgment that the concourse of a large airport facility like the one in St. Louis has the character, pattern of activity, and nature of purpose that make it an appropriate place for the communication of views.... As has been noted, an airport terminal is much like a busy city street. Both are lined by shops, restaurants, newsstands, and other businesses, with travelers or other members of the general public coming and going as they please."

*See also Fernandes v. Limmer,* 663 F.2d 619 (5th Cir.1981) (Dallas–Ft. Worth airport terminal constituted a public forum in which efforts to regulate speech were subject to First Amendment free speech guarantees).

We hold that the common area walkways of the Jamestown Mall constitute a public forum and that attempted regulation of expressive activity in these areas must comport with the First Amendment. The mall authorities may regulate the time, place and manner of expression in the mall. However, the regulations must be reasonable, content-neutral, narrowly tailored to serve a significant government interest, and must leave open ample alternative channels of communication. *Perry Education, supra.*

■■■ The regulation of expression by the mall authorities in this case does not fall within the First Amendment limits for restricting expressive activity in a public forum. The posted notice at the Jamestown Mall states that anything which might be classified as "expressive activity" will not be permitted. The mall authorities enforced that notice by refusing to allow the appellants to peacefully protest in the common areas of the mall. Concluding that similar language was facially overbroad and in violation of the First Amendment, the United States Supreme Court in *Board of Airport Commissioners v. Jews for Jesus, Inc., supra,* 482 U.S. at 575, 107 S.Ct. at 2572, 96 L.Ed.2d at 508, stated that "no conceivable governmental interest would justify such an absolute prohibition of speech." This all-encompassing ban on expressive activity by the Jamestown Mall is legally indistinguishable from the facially invalid resolution in *Jews for Jesus, Inc., Id.*

We hold that the appellants' trespass convictions constituted an infringement of their First Amendment rights of free speech and peaceable assembly. For that reason, the judgments of conviction are reversed.

ERICKSTAD, C.J., and VANDE WALLE, GIERKE and MESCHKE, JJ., concur.