2009 ND 115

**Roland C. RIEMERS, Plaintiff and Appellant**

v.

**STATE of North Dakota for the UNIVERSITY OF NORTH DAKOTA, Defendant and Appellee.**

**No. 20080332.**

Supreme Court of North Dakota.

July 9, 2009.

Roland C. Riemers, pro se, P.O. Box 14702, Grand Forks, N.D. 58208, plaintiff and appellant; submitted on brief.

Douglas A. Bahr, Solicitor General, Office of Attorney General, 500 N. 9th St., Bismarck, N.D. 58501–4509, for defendant and appellee; submitted on brief.

MARING, Justice.

[¶ 1]   Roland Riemers appeals a district court's summary judgment in favor of the State of North Dakota for the University

of North Dakota. We affirm, concluding the district court did not err in granting summary judgment in favor of the State.

## I

[¶ 2] Riemers sued the State of North Dakota in September 2006, alleging the University denied him his right to audit law school classes and violated his First Amendment rights by denying his rights to free speech and to collect political signatures on the University campus. The State moved to dismiss, arguing Riemers had not stated a claim upon which relief could be granted. The district court granted the State's motion on January 5, 2007. Riemers appealed. The North Dakota Court of Appeals affirmed the district court's dismissal of Riemers' claim that he had a legal right to audit classes, but reversed the district court's order on Riemers' free speech claim and remanded for the district court to treat the motion as one for summary judgment. *Riemers v. State ex rel. University of North Dakota,* 2007 ND App 4, ¶ 11, 739 N.W.2d 248. On June 20, 2008, the State moved for summary judgment. Riemers replied in opposition to the State's motion for summary judgment on August 7, 2008. The State replied to Riemers' opposition to the State's motion for summary judgment. The parties submitted a joint stipulation of facts to the district court. The joint stipulation of facts explains the underlying facts that led to Riemers' lawsuit and provides, in relevant part:

7. During August 2006, Roland C. Riemers (Riemers) and a few other individuals were gathering signatures for the Family Law Reform Initiative outside the Memorial Union. To solicit signatures the petitioners set up a small table off the sidewalk outside the Memorial Union entrance. According to Riemers, the petitioners had not requested permission to solicit signatures.

8. Near the end of August 2006, Riemers alleges he received a phone call from an unidentified University employee who informed Riemers that he needed to renew his permission to solicit signatures if the petitioners were going to do more petitioning in September. On September 11, 2006, the University received a request from Riemers to collect signatures. The request stated:

> This is to notify you that we would like to have 1 to 5 people collecting signatures at the UND for the month of September. We would like to be inside common areas of buildings, outside sidewalks & lawns, and in housing area. We understand, & agree not to disrupt classes or the normal business operations of the University.

Ex. 5.

9. By memorandum dated September 15, 2006, the University granted Riemers "official permission" to collect signatures "inside common areas of buildings, sidewalks, and lawns at the University of North Dakota campus, during the month of September 2006." Ex. 6. The memorandum informed Riemers that "[p]ermission to collect signatures inside housing areas must be obtained by the Housing Office." *Id.* The memorandum then quoted the Policy on Petitions from the Code of Student Life. *Id.*

10. By memorandum dated September 29, 2006, Riemers requested "an extension of the September 15 authorization for the Family Law Reform Initiative to continue collecting petition signatures on the UND Campus through the month of October, under

the same previous terms and conditions." Ex. 7.

11. By letter dated October 5, 2006, the University granted Riemers an extension to solicit signatures. Ex. 8. The letter also informed Riemers of two complaints regarding the petitioners, and that if the petitioners violate Section 5–7 of the Code of Student Life, the permission to solicit signatures will be revoked and the petitioners will be asked to leave campus. *Id.*

12. Richard Riemers was one of the petitioners collecting signatures for the Family Law Reform Initiative. Richard Riemers began soliciting signatures door to door at student apartments. At the second apartment complex, a resident informed Richard Riemers that he needed to get permission from the Housing Office to solicit signatures. The next day Richard Riemers and his father, Roland Riemers, went to the Housing Office and completed an Apartment Solicitation Form. Ex. 9. Approval for Richard Riemers to solicit signatures was granted the next day. *Id.* After receiving the permission form, Richard Riemers solicited signatures at student apartments without incident.

13. At no time did Richard Riemers attempt to solicit at student dorms. Student dorms are distinguished from student apartments in that student apartment doors are open to the outside, while student dorms require a pass key to get into the building and access the individual dorm rooms.

14. Roland Riemers never tried to solicit signatures at student apartments or student dorms.

15. Salvecion Hufnagel (Hufnagel) was another petitioner collecting signatures for the Family Law Reform Initiative. Riemers asked Hufnagel to solicit signatures in the Memorial Union. When Hufnagel was in the entryway of the Memorial Union, a student manager told Ms. Hufnagel that she was not supposed to be there. Because she did not have permission to solicit in the Memorial Union, Hufnagel left the Memorial Union without further discussion. The Memorial Union employee did not threaten Hufnagel in anyway.

16. After Roland Riemers obtained general permission to solicit signatures on the UND campus, Hufnagel went into the Memorial Union and began soliciting signatures. Hufnagel did not have permission from the Memorial Union to solicit signatures in the Memorial Union. Furthermore, Hufnagel was not behind a table when attempting to solicit signatures at the Memorial Union. A Memorial Union employee approached Hufnagel and told her she was not supposed to be there. Hufnagel informed the Memorial Union employee that she had permission papers. The Memorial Union employee asked to see the permission papers. Rather than show the Memorial Union employee the permission papers, Hufnagel left the Memorial Union without further discussion. The Memorial Union employee did not threaten Hufnagel in anyway.

17. After Hufnagel left the Memorial Union, Riemers went into the Memorial Union and talked to a student manager.... Riemers and the University disagree regarding the substance of the communications between Riemers and the student manager. According to Riemers, the student manager told Riemers that petitioners could not collect signatures inside the Memorial Union because the Memorial Union had received two complaints.

Contrary to Riemers' recollection, the student manager reports that he explained to and showed to Riemers the solicitation policy, and that he explained to Riemers that solicitors could not approach individuals in the traffic areas but needed to stay behind the tables. The student manager reports he told Riemers that solicitors could not solicit signatures in the Memorial Union if they were not willing to stay behind the tables. According to the student manager, at no time did he tell Riemers that Riemers or other petitioners had to leave the Memorial Union. Riemers continued to gather signatures on UND campus after his conversation with the student manager.

18. At no time did Riemers, Richard Riemers, or Hufnagel use the appeal procedure in subsection 5–3 of the Code of Student Life. Ex. 1, at p. 29.

[¶ 3] The parties waived a hearing on the summary judgment motion. The district court concluded, as a matter of law, that the University's policies were constitutional and did not violate Riemers' right to free speech; Riemers did not exhaust his administrative remedies; and Riemers' request for injunctive relief was moot. The district court granted the State's motion for summary judgment.

[¶ 4] Riemers appeals, arguing the University's Apartment Solicitation Policy is facially unconstitutional, the University's campus policy on petitioning is unconstitutional because petitioners must first register a special events form, the University's Memorial Union policy is facially unconstitutional, the district court erred in concluding Riemers did not first exhaust his administrative remedies before suing the University, and the district court erred in concluding Riemers' request for injunctive relief was moot.

## II

[¶ 5] Summary judgment is a procedural device that promptly and expeditiously disposes of an action without a trial "if either litigant is entitled to judgment as a matter of law and if no dispute exists as to either the material facts or the inferences to be drawn from undisputed facts, or if resolving factual disputes will not alter the result." *Alerus Financial v. Western State Bank,* 2008 ND 104, ¶ 16, 750 N.W.2d 412. "Whether the district court properly granted a summary judgment motion is a question of law that we review de novo on the record." *Id.*

[¶ 6] Riemers argues the district court erred in granting summary judgment in favor of the State on his free speech claims because the University's policies on solicitation and petitioning are unconstitutional in three respects: (1) the University improperly required him to complete an event form before gathering signatures on the University's campus; (2) the University improperly required Riemers to complete an Apartment Solicitation Form before being allowed to solicit signatures at student apartments; and (3) the University's Memorial Union policies improperly required petitioners to sit at a table and wait for students to come over. Furthermore, in regard to the University's Memorial Union policies, Riemers argues the district court erred in concluding he had to exhaust his administrative remedies and his request for injunctive relief was moot.

## III

[¶ 7] Riemers argues the University's policy requiring he complete a special events form before gathering signatures on the University's campus is unconstitutional. More specifically, he contends he should not be required to register and

receive official permission before petitioning on state property.

■ [¶ 8] We begin first by noting that Riemers' claim that the First Amendment guarantees him the right to use the University's campus to gather signatures without being subject to any restrictions is unsupported by the law. The United States Supreme Court has held that individuals are not guaranteed access to government-owned property for First Amendment purposes. *Perry Educ. Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 46, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983). Likewise, this Court has held that an individual is not guaranteed the right to communicate views at all times and places or in any manner desired. *Bolinske v. North Dakota State Fair Ass'n,* 522 N.W.2d 426, 431 (N.D.1994); *Fargo Women's Health Organization, Inc. v. Lambs of Christ,* 488 N.W.2d 401, 407 (N.D.1992). We have held that "[t]he First Amendment does not require the government to freely grant access to all who wish to exercise free speech on every type of governmental property, without regard to the nature of the property or to the disruption that might be caused by the speaker's activities." *Bolinske,* 522 N.W.2d at 431. Furthermore, "[e]ven speech involving the discussion of governmental affairs, the essence of self-government, exercised in 'quintessential public forums' such as parks and sidewalks, may interfere with other important activities for which that public property is used, and the government may regulate the time, place, and manner of that expressive activity." *Id.*

■ [¶ 9] When considering whether to allow individual speech on government property, courts are to employ "a forum analysis for balancing the government's interest in limiting the use of its property to its intended purpose and the interests of those wanting to use the property for expressive activity and other purposes." *Id.* We explained the forum analysis in *City of Jamestown v. Beneda,* 477 N.W.2d 830, 837 (N.D.1991) (citations omitted):

> In balancing the government's interest in limiting the use of its property against the interests of those who wish to use the property for expressive activity, the Court has identified three types of fora: the traditional public forum, the public forum created by government designation, and the nonpublic forum. The proper First Amendment analysis differs depending on whether the area in question falls in one category rather than another. In a traditional public forum or a public forum by government designation, we have held that First Amendment protections are subject to heightened scrutiny:
>
> > In these quintessential public forums, the government may not prohibit all communicative activity. For the State to enforce a content-based exclusion it must show that its regulation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end.... The State may also enforce regulations of the time, place, and manner of expression which are content-neutral, are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication.
>
> We have further held, however, that access to a nonpublic forum may be restricted by government regulation as long as the regulation is reasonable and not an effort to suppress expression merely because officials oppose the speaker's view.

■ [¶ 10] Furthermore, the United States Supreme Court has stated that First Amendment rights in the context of

a university must be analyzed "in light of the special characteristics of the school environment." *Widmar v. Vincent,* 454 U.S. 263, 268 n. 5, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981). In *Widmar,* the Court explained the uniqueness of a university setting:

> A university differs in significant respects from public forums such as streets or parks or even municipal theaters. A university's mission is education, and decisions of this Court have never denied a university's authority to impose reasonable regulations compatible with that mission upon the use of its campus and facilities. We have not held, for example, that a campus must make all of its facilities equally available to students and nonstudents alike, or that a university must grant free access to all of its grounds or buildings.

*Id.* Thus, a university may establish reasonable time, place, and manner regulations when permitting access to its campus and facilities. *Id.* at 276.

[¶ 11] Applying the forum analysis to the university setting can be challenging because of the varying types of forums on a university campus. *See Bowman v. White,* 444 F.3d 967, 976–77 (8th Cir.2006) (explaining that "[a] modern university contains a variety of fora" and "labeling the campus as one single type of forum is an impossible, futile task"); *Roberts v. Haragan,* 346 F.Supp.2d 853, 863 (N.D.Tex.2004) (concluding that a university campus makes up "a variety of forums"). Although the University's campus contains a variety of forums, it is unnecessary for us to address each type of forum on the University's campus. Riemers sought to collect signatures inside common areas of buildings, sidewalks, and lawns of the University. Even if we determined that the entire University campus qualified as a public forum, the forum that permits the least restrictions on speech, we would still conclude the University's requirement that individuals wishing to petition complete a special events form does not violate Riemers' First Amendment rights.

[¶ 12] We find *Bowman v. White,* 444 F.3d 967 (8th Cir.2006), persuasive and instructive on the issues of forum designation and the applicable level of scrutiny given to restrictions on speech. In that case, a street preacher alleged a university's policy regarding the use of its outdoor space and facilities contained restrictions, which unconstitutionally violated his free speech rights. *Id.* at 972. The Court of Appeals for the Eighth Circuit recognized the Supreme Court uses a forum analysis for evaluating restrictions of speech on government property which requires a court to determine whether a property is a traditional public forum, a designated public forum, or a nonpublic forum. *Id.* at 974. "Once a court makes a determination on the nature of the forum, it then applies the appropriate standard of scrutiny to decide whether a restriction on speech passes constitutional muster." *Id.* (citations omitted). The court noted that in a traditional public forum, the government may enforce "a reasonable, content-neutral time, place and manner restriction" if the restriction is narrowly tailored to serve a significant government interest and leaves open ample alternative channels of communication. *Id.* at 975. Likewise, in an "unlimited designated public forum, the government may enforce a content-neutral time, place, and manner restriction, ... if the restriction is necessary to serve a significant government interest and is narrowly drawn to achieve that interest." *Id.* at 976. Thus, whether we analyze the areas involved in the present case as public forums or as unlimited designated public forums, the standard of scrutiny is the same under the stipulated facts of the present case.

[¶ 13] The parties stipulate that Section 5 of the UND Code of Student Life addresses the use of the University's facilities. Subsection 5–7, titled "Policy on Petitions" provides:

5–7 POLICY ON PETITIONS

A. Signatures may be gathered on campus as long as there is no disturbance or interference with the regular academic or institutional programs or with the free and unimpeded flow of pedestrians or with vehicular traffic; and/or as long as there is no harassment, embarrassment, and/or intimidation of the person being requested to sign. The use for which the signatures are being solicited is to be clearly defined.

B. In cases where solicitation or petitioning does not conform to the above polices and/or where it is deceptive as to purpose in any way, the University may ask the offending parties to leave the campus and/or prevent them from future access to the campus.

The University's Code of Student Life, Section 5–1(F), provides that persons wishing to hold an on-campus event must complete a "Special Events Form." The parties stipulate that petitioning is a special event that requires the completion of a special events form. The parties also do not dispute that the University's policy of requiring the completion of a special events form for all who wish to gather signatures on the University's campus is content-neutral in that the requirement applies to anyone who wants to solicit signatures on the University's campus.

[¶ 14] Because the policy is content-neutral, we next consider whether the policy is narrowly tailored to serve a significant government interest and leaves open ample alternative channels of communication. *See Beneda*, 477 N.W.2d at 837. We conclude that the University had a significant governmental interest. The Code of Student Life provision governing special events explains it has the responsibility of "reviewing events held on-campus to assure that they do not represent an unreasonable risk to participants, other members of the campus community, or University property." The Code of Student Life also states that special events policies exist so that "institutional property may be protected and that the facility use is consistent with its designed intent." The Code of Student Life further explains that the special events form was developed "[t]o aid in event planning." The University's interests of protecting individuals and campus property, ensuring the facilities are appropriately used, and aiding in event planning are significant governmental interests.

[¶ 15] Furthermore, the policy is narrowly tailored to serve that significant governmental interest. "A regulation is narrowly tailored when it furthers a significant government interest that would be achieved less effectively without the regulation. The [policy] does not, however, need to be the least restrictive means of regulation possible." *Bowman*, 444 F.3d at 980. The University's policy of completing the special events form before soliciting on the University's campus furthers the goals of aiding in event planning, protecting the safety of individuals and campus property, and ensuring the facilities are appropriately used. The University's goals would be less effectively achieved without the regulation because school officials may not be aware of the events on campus and may not be able to ensure that the campus and community members are adequately protected.

[¶ 16] Finally, the event approval policy also leaves open alternative channels of communication for the expression of protected speech because solicitors are allowed to solicit signatures on the University's campus. Riemers was permitted to gather signatures and express his views and, in fact, Riemers concedes he was permitted to access the University's campus to gather signatures. The University granted him permission to solicit signatures on campus, extended that permission on two occasions, and never denied Riemers the opportunity to solicit signatures on campus. The policy is content-neutral, narrowly tailored to serve an important governmental interest, and leaves open ample alternative channels of communication. Therefore, we conclude the University's event approval policy is a reasonable time, place, and manner restriction.

IV

■ [¶ 17] Riemers argues the University's Apartment Solicitation Policy is unconstitutional because it restricts solicitation to the hours between 9 a.m. and 8 p.m., requires completion of an Apartment Solicitation Form, and requires solicitors to carry and present an approved Apartment Solicitation Form and personal identification for apartment residents and officials to inspect. Riemers also argues that the Housing Policy that requires each dorm must first be individually contacted and permission obtained before dorm residents are contacted is especially unconstitutional. Riemers contends that this latter requirement is so burdensome that it effectively eliminates political free speech in the University dorms.

[¶ 18] On appeal, part of Riemers' argument pertains to policies governing student dorms. Riemers did not raise this argument to the district court. Because Riemers did not argue this to the district court, we will not consider the argument on appeal. *See John T. Jones Constr. Co. v. City of Grand Forks*, 2003 ND 109, ¶ 18, 665 N.W.2d 698 ("It is axiomatic that an issue or contention not raised or considered in the lower court cannot be raised for the first time on appeal from judgment.").

[¶ 19] We will consider, however, the general argument that the University's Apartment Solicitation Policy is unconstitutional because that argument was appropriately raised to the district court. The University's Apartment Policy Book contains a policy on solicitation and sales. The policy defines solicitation and provides a list of solicitations that have been authorized. Political campaigns are included in the list of authorized solicitations. The policy provides,

> No door-to-door solicitation is permitted in the University Apartment community without prior written authorization from the Housing Office. If authorized by the Housing Office, the door-to-door solicitor will be issued a copy of an approved UND Apartment Solicitation Form. The solicitor agrees to abide by [certain] provisions.

These provisions include, among others, that door-to-door solicitations be limited from 9:00 a.m. to 8:00 p.m.; the solicitor carry, and display upon request, the approved Apartment Solicitation Form and personal identification; and the solicitor honor all requests for no solicitation. The policy also requires that the solicitor not interfere with academic or institutional programs being conducted on campus or interfere with the free and unimpeded flow of traffic on sidewalks, streets, or in campus buildings.

■ [¶ 20] Applying the forum analysis we explained in *Beneda* and *Bolinske*, we conclude the University apartments are a nonpublic forum. In *Beneda* and *Bol-*

*inske,* we concluded the forums at issue qualified as public forums. *See Beneda,* 477 N.W.2d at 838; *Bolinske,* 522 N.W.2d at 432. In *Beneda,* we explained that the Jamestown Mall constituted a traditional public forum and stated, "[e]xamples of public fora are public streets and parks which have traditionally been devoted to public assembly and debate." *Beneda,* 477 N.W.2d at 837. We reasoned that the Jamestown Mall was "an appealing place for the public to converse," and concluded that it lent itself to the "expressive activity of the public." *Id.* at 837–38. We held that the common area walkways of the Jamestown Mall constituted a public forum, and the mall authorities could regulate time, place, and manner restrictions in the mall, but the regulations must be content-neutral, narrowly tailored to serve a significant government interest, and must leave open ample alternative channels of communication. *Id.* at 838. Likewise, we concluded that the state fair, the forum at issue in *Bolinske,* was a public forum. 522 N.W.2d at 432. We explained that "[t]he state fair is a special annual event of very limited duration, with a specific objective of providing thousands of attendees a wide variety of information and entertainment." *Id.*

[¶ 21] The University apartments in this case are not similar to the forums at issue in *Beneda* and *Bolinske.* The University apartments are not areas that traditionally have been devoted to public assembly and debate, nor has the University designated the apartments as a public forum. *See Sammartano v. First Judicial District Court,* 303 F.3d 959, 966 (9th Cir. 2002) (citation omitted) (holding that a government building was a nonpublic forum because it was not "opened for use by the public as a place for expressive activity," had not "been intentionally opened for expression by certain groups or on certain topics," and was not "like a public

street or park, the kind of public property that has 'by long tradition or by government fiat ... been devoted to assembly and debate'"). The Apartment Policy Book provides that "University apartments are rented as student housing." The University apartments were built for the purpose of providing students housing, not for the purpose of providing a place for assembly and debate. *See International Society for Krishna Consciousness, Inc. v. Lee,* 505 U.S. 672, 682, 112 S.Ct. 2701, 120 L.Ed.2d 541 (1992) (holding that airport terminals are nonpublic forums because "Port Authority management considers the purpose of the terminals to be the facilitation of passenger air travel, not the promotion of expression"); *Daniel v. City of Tampa,* 38 F.3d 546, 550 (11th Cir.1994) (holding that the mission of government housing is "to provide safe housing for its residents, not to supply non-residents with a place to disseminate ideas"); *Sammartano,* 303 F.3d at 966 (holding that a government building was a nonpublic forum because it was built and operated "for the purpose of conducting the business of the county and of the municipal and state courts" and was not designated or intended to be a public forum). Because the University apartments are nonpublic forums, the government can regulate the use of the apartments "as long as the regulation is reasonable and not an effort to suppress expression merely because officials oppose the speaker's view." *See Beneda,* 477 N.W.2d at 837 (citations omitted); *Bowman,* 444 F.3d at 976 (citations omitted).

[¶ 22] We conclude the University's regulations of campus apartments are reasonable and not an effort to suppress Riemers' expression merely because the University officials oppose his views. First, the University's Apartment Solicitation Policy is reasonable in that it serves

significant governmental interests and imposes only minimal restrictions. The solicitation and sales policy requires that a solicitor must honor any resident's request for no solicitation, may only solicit between 9:00 a.m. and 8:00 p.m., and must not harass, embarrass, or intimidate a resident. The policy protects the privacy of the residents of the University apartments. The University's policy also protects residents' educational experiences and public safety. The policy precludes solicitors from interfering with "academic or institutional programs being conducted on the campus" and from interfering with the flow of pedestrian and vehicular traffic on sidewalks, streets, and entrances to campus buildings. We conclude these are also significant governmental interests. Furthermore, the University's Apartment Solicitation Policy imposes only minimal restrictions and still permits solicitation in university apartments and at other locations on the University campus. In fact, Riemers completed the solicitation form, and the University notified him the following day that he was approved to solicit signatures at the University apartments. Although he never attempted to solicit signatures in university apartments, he was never precluded from doing so.

[¶ 23] Second, the University's Apartment Solicitation Policy is not an effort to suppress expression merely because officials oppose the speaker's views. The policy applies equally to all who wish to solicit or sell goods in the University's apartments. The policy also applies regardless of a solicitor's purpose or the content of the message. Because the University's Apartment Solicitation Policy is view-point neutral and is a reasonable regulation, we conclude it is a reasonable time, place, and manner restriction.

## V

[¶ 24] Riemers argues the University unconstitutionally denied him permission to gather signatures in the Memorial Union because of two union policies pertaining to petition signing. First, he contends petitioners should not be required to sit at designated tables and wait for passing students to come to the table to talk to them because that effectively blocks the interactive communication a political issue requires. Second, he asserts the University's policy prohibiting harassment, embarrassment, and intimidation of a person requested to sign a petition violates the First Amendment.

[¶ 25] Again, we initially consider the type of forum at issue. The University concedes that at least the part of the main floor of the Memorial Union where display tables are set up is a designated public forum. We agree and conclude the area on the main floor of the Memorial Union building is designated for public use.

[¶ 26] As we explained in *Beneda*, First Amendment protections are subject to heightened scrutiny in a traditional public forum and a public forum by government designation. 477 N.W.2d at 837. Thus, the University may enforce regulations of the time, place, and manner of expression that are content-neutral, narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication. *Id.*

[¶ 27] Riemers first challenges the University's policy regarding the Memorial Union requirement that solicitors sit at designated tables. We conclude this policy is content-neutral in that the University requires all solicitors and others who want to participate in expressive activity in the Memorial Union to sit at designated tables. This policy also serves a significant governmental interest. It prevents interference with the free and

unimpeded flow of pedestrian traffic through the Memorial Union. The safety and convenience of persons using the Memorial Union is a significant governmental interest. *See Bolinske*, 522 N.W.2d at 434. This is especially true in a situation whereby solicitors are seeking donations or signatures because such a situation requires action by those who would respond. As we explained in *Bolinske*:

> The process of soliciting signatures requires discussion on the merits of the measure proposed with each person approached to sign. The process invites a response, which may entail a reading of the measure, additional discussion, and eventual signing of the petition. Thus, the petition circulation process may result in substantial disruption of fair patrons, especially if numerous petitioners choose to use the fair as a place for soliciting signatures.

*Id.* at 434. Furthermore, the University's significant interest is narrowly tailored to its policy because it allows for solicitors to collect signatures and only restricts the solicitors to the extent required to protect the safety and convenience of patrons of the Memorial Union.

[¶ 28] Finally, the policy leaves open ample alternative channels of communication in that Riemers was allowed to solicit signatures in the Memorial Union building, subject to the reasonable restrictions. Riemers also could have solicited off the University's campus. Further, the University granted Riemers permission to solicit signatures "inside common areas of buildings, sidewalks, and lawns at the University of North Dakota campus." Because the Memorial Union policy requiring solicitors to sit behind designated tables in the Memorial Union building is content-neutral, narrowly tailored to serve a significant government interest, and left open ample alternative channels of communica-

tion, we conclude it is a reasonable time, place, and manner restriction and does not violate the First Amendment.

[¶ 29] Riemers' second challenge regarding the Memorial Union policies is the prohibition on harassing, embarrassing, or intimidating persons requested to sign a petition. We treat Riemers' argument both as a facial challenge and an as-applied challenge.

A

[¶ 30] We first consider his facial challenge to the policy. Riemers argues that the University's Memorial Union policy violates the First Amendment because it effectively blocks the interactive communication a political issue requires. We disagree. The Memorial Union policy provides:

> If the Memorial Union receives reports that petitioners are making people feel harassed, embarrassed or intimidated, the staff will (1) make the petitioner aware of their behavior, and (2) advise them that if it happens again, they will be asked to leave the premises. If the behavior continues, the incident will be reported to the University Police Department.

[¶ 31] This policy is content-neutral because it is a requirement applied to all individuals soliciting signatures on the University's campus. The policy ensures individuals are not harassed, embarrassed, or intimidated by solicitors and protects the educational experiences of students. These are significant governmental interests. *See Glover v. Cole*, 762 F.2d 1197, 1202 (4th Cir.1985) ("[The State has] a significant interest in protecting the students from the harassment of insistent hawkers and possibly fraudulent solicitations."). The University's significant interest is narrowly tailored to its policy, and the policy leaves open ample alternative

channels of communication. The policy does not prohibit persons from engaging in solicitation, rather, the policy merely prohibits conduct that harasses, embarrasses, or intimidates individuals. Furthermore, it is significant that offenders of the policy are advised of their behavior and informed of the consequences of repeated behavior in the Memorial Union before offenders are asked to leave the premises. We conclude the Memorial Union policy prohibiting harassment, embarrassment, or intimidation is, on its face, a valid time, place, and manner restriction.

## B

[¶ 32] In addition to Riemers' facial challenge of the Memorial Union policy prohibiting harassment, embarrassment, or intimidation, Riemers also raises an as-applied challenge to the policy. Riemers' complaints of the policy stem from a letter he received from the University and an encounter with a Memorial Union student manager.

[¶ 33] In September 2006, Riemers requested permission to collect signatures for the month of September. Through a letter, the University granted Riemers' request and informed him that he could collect signatures if he complied with the policies on gathering signatures. At the end of September, Riemers requested an extension of that authorization. The University sent Riemers a letter in early October 2006 informing him that the University had received two complaints about individuals soliciting with Riemers. Allegedly, two members of Riemers' group were "rude, confrontational, and either had the petition information buried on his or her clipboard or failed to have the petition information with her or him." The letter further provided that it was granting Riemers an extension to solicit signatures, however, if he or his group violated that

provision again, permission would be revoked immediately.

[¶ 34] Riemers also claims that a Memorial Union student manager informed him that two University students felt uncomfortable about being asked to sign a measure they did not approve and that feeling uncomfortable was considered harassment and would not be tolerated. Riemers claims the student manager told him that he could not collect signatures inside the Memorial Union because of the complaints. Contrary to Riemers' claims, the Memorial Union student manager reported that he showed and explained the solicitation policy to Riemers and did not tell Riemers to leave the Memorial Union. Although a dispute about this interaction exists, both parties agree that Riemers continued soliciting signatures after the disagreement between Riemers and the student manager.

[¶ 35] The district court granted summary judgment on these issues, concluding Riemers did not first exhaust his administrative remedies before suing and his request for injunctive relief was moot.

### 1

[¶ 36] The district court noted that the only factual dispute in the case involved the question of whether the Memorial Union student manager actually told Riemers to leave the Memorial Union. The district court concluded that, even if it assumed Riemers' statement that he and others were asked to leave the Memorial Union was true, Riemers was required to use the appeal procedure in the Code of Student Life. On appeal, Riemers argues he was never told to leave the Memorial Union by the student manager. Riemers' argument on appeal conflicts with the facts to which he stipulated. Because Riemers has conceded he was not ordered to cease soliciting signatures in the Memorial Union, we conclude his as-applied challenge to the

Memorial Union policy is without merit. Further, the Code of Student Life section 5-3 providing the appeal procedure for use of university facilities is not clear whether it applies only to students and student organizations or also non-university groups and organizations. Therefore, although the State argues the appeal procedure applies, it is not evident that it applies to a non-university group or organization. Riemers' concession makes it unnecessary for us to address whether he was required to exhaust administrative remedies.

2

[¶ 37] The district court dismissed Riemers' as-applied challenge on the grounds summary judgment was appropriate because Riemers' request for injunctive relief was moot. On appeal, Riemers argues the district court erred in granting summary judgment because his request for relief was not moot. He contends he is seeking a prospective declaration that initiative petitions may be freely circulated on campus in the future. We disagree.

[¶ 38] "An appeal is moot when an appellate court is unable to render effective relief due to the lapse of time or the occurrence of related events." *Bolinske*, 522 N.W.2d at 430. We have also explained that an issue is moot when there is no actual controversy left to be determined. *See Ramsey Fin. Corp. v. Haugland*, 2006 ND 167, ¶ 8, 719 N.W.2d 346. We conclude there is no actual controversy left to be determined in this case because the University allowed Riemers to solicit signatures on the petition even after the alleged incident, the University granted him two extensions of his solicitation request, and the time to solicit signatures for the Family Law Reform Initiative to the 2007 legislature has passed.

[¶ 39] Furthermore, on appeal, Riemers requests a prospective declaration that initiative petitions may be freely circulated on the University's campus in the future. However, he did not request the remedy of declaratory relief in his complaint. Rather, his complaint provides that he is requesting, "[i]njunctive relief preventing the University of North Dakota from limiting free speech activities on and in University property unless such activities are done in such a way as to violate state law or are an actual disruption to classes." Riemers cannot now request declaratory relief when he did not request such a remedy in his complaint or present this argument to the district court. *See Heng v. Rotech Medical Corp.*, 2006 ND 176, ¶ 9, 720 N.W.2d 54 ("We do not address issues raised for the first time on appeal."). Therefore, we conclude the district court did not err in granting summary judgment on Riemers' as-applied challenge to the Memorial Union policy because his request for injunctive relief was moot.

VI

[¶ 40] We conclude the district court did not err in granting summary judgment in favor of the State and affirm the district court's summary judgment.

[¶ 41] GERALD W. VANDE WALLE, C.J., CAROL RONNING KAPSNER and DANIEL J. CROTHERS, JJ., concur.

DALE V. SANDSTROM, concurs in the result.